240 P.3d 800 (2010)
STATE of Washington, Respondent,
v.
Michael Lee LEYERLE, Appellant.
No. 37086-7-II.
Court of Appeals of Washington, Division 2.
October 5, 2010.
*801 Lisa Elizabeth Tabbut, Attorney at Law, Longview, WA, for Appellant.
Amie L. Hunter, Hall of Justice, Cowlitz Prosecuting Attorneys Office, Kelso, WA, for Respondent.
VAN DEREN, J.
¶ 1 Michael Lee Leyerle appeals his conviction for unlawful possession of methamphetamine, asserting that the trial court improperly conducted a portion of voir dire outside of the courtroom and, therefore, a new trial is warranted. We agree, reverse Leyerle's conviction for unlawful possession of methamphetamine, and remand for further proceedings.

FACTS
¶ 2 The State charged Leyerle with unlawful possession of methamphetamine on November 16, 2007.[1] During voir dire, the trial court asked if any jurors felt that they could not be impartial if they were to be on Leyerle's jury. When a prospective juror indicated that he could not be impartial, the trial court asked the prospective juror and both counsel to join him in the hallway. The hallway discussion between the trial judge, prosecutor, defense counsel, and the prospective juror was recorded.[2] The trial judge asked defense counsel if Leyerle wanted to join them in the hallway. Defense counsel's response was inaudible and not recorded, but later, before they returned to the courtroom, the trial judge stated, "There were no spectators who waived their right to be here [defendant] doesn't want to be here and his counsel said [he] didn't want to be here. Isn't that correct?" Report of Proceedings (RP) Voir Dire at 20. Defense counsel responded affirmatively.
¶ 3 In the hallway, the prospective juror explained that, based on his many years as a law enforcement officer in California, "[he] would be prejudice[d] towards the law enforcement side." RP Voir Dire at 19. Defense counsel successfully challenged the prospective juror for cause. Also in the hallway, defense counsel noted that he had had "[a]lmost twenty-five years of pretty constant contact" with another potential juror. RP Voir Dire at 21. The State said it would question the juror about those contacts and later did so in open court.
¶ 4 The trial judge, prosecutor, defense counsel, and the prospective juror then returned to the courtroom. The trial court excused the prospective juror. Then, voir dire resumed and a jury was seated that ultimately convicted Leyerle of unlawful possession of methamphetamine.
¶ 5 Leyerle appeals, arguing that the trial court erred in conducting a portion of voir dire outside the courtroom.[3]

ANALYSIS
¶ 6 We note at the outset that our recent decision in State v. Paumier, 155 Wash.App. 673, 230 P.3d 212 (2010) resolves this case. *802 We adhere to and apply Paumier to Leyerle's appeal.
¶ 7 Whether a trial court procedure violates the right to a public trial is a question of law we review de novo. State v. Brightman, 155 Wash.2d 506, 514, 122 P.3d 150 (2005). The remedy for such a violation is reversal and remand for a new trial. In re Pers. Restraint of Orange, 152 Wash.2d 795, 814, 100 P.3d 291 (2004). A defendant who fails to object at the time of the closure does not waive the right. Brightman, 155 Wash.2d at 514-15, 122 P.3d 150.
¶ 8 The state and federal constitutions guarantee the right to a public trial. Article I, section 22 of the Washington State Constitution provides, "In criminal prosecutions the accused shall have the right ... to have a speedy public trial." The Sixth Amendment to the United States Constitution states, "In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial." Moreover, article I, section 10 of the Washington State Constitution provides that "[j]ustice in all cases shall be administered openly, and without unnecessary delay." This provision secures the public's right to open and accessible proceedings. State v. Easterling, 157 Wash.2d 167, 174, 137 P.3d 825 (2006). These provisions ensure a fair trial, foster public understanding and trust in the judicial system, and give judges the check of public scrutiny. Brightman, 155 Wash.2d at 514, 122 P.3d 150; Dreiling v. Jain, 151 Wash.2d 900, 903-04, 93 P.3d 861 (2004). While the public trial right is not absolute, it is strictly guarded to ensure that proceedings occur outside the public courtroom in only the most unusual circumstances. Easterling, 157 Wash.2d at 174-75, 137 P.3d 825; Orange, 152 Wash.2d at 804-05, 100 P.3d 291; State v. Bone-Club, 128 Wash.2d 254, 258-59, 906 P.2d 325(1995).
¶ 9 The guaranty of open criminal proceedings extends to voir dire. Orange, 152 Wash.2d at 804, 100 P.3d 291. In Orange and Bone-Club, our Supreme Court set out the standards for closing all or any portion of a criminal trial. Orange, 152 Wash.2d at 800, 805, 100 P.3d 291; Bone-Club, 128 Wash.2d at 258-59, 906 P.2d 325. Bone-Club adopted a five part analysis designed to protect a criminal defendant's right to a public trial.[4]Bone-Club, 128 Wash.2d at 258-60, 906 P.2d 325; see also Seattle Times Co. v. Ishikawa, 97 Wash.2d 30, 36-39, 640 P.2d 716 (1982) (setting forth five part analysis under the Washington State Constitution article I, section 10).
¶ 10 Our Supreme Court has explained that Bone-Club's "`five-step closure test'" is essentially a restatement and adoption of the federal closure criteria expressed in Waller v. Georgia, 467 U.S. 39, 104 S.Ct. 2210, 81 L.Ed.2d 31 (1984).[5]See Orange, 152 Wash.2d at 805-07, 100 P.3d 291. See also Brightman, 155 Wash.2d at 515 n. 5, 122 P.3d 150. As we explained in Paumier, "our Supreme Court [in Momah] seemed to back away from its earlier articulation in Orange that application of the Bone-Club guidelines is required and that the failure to so employ them when closing the courtroom is reversible error." 155 Wash.App. at 680, 230 P.3d 212.
*803 ¶ 11 Momah purportedly relied on Waller in concluding that a new trial was not warranted where the trial court closed voir dire without applying the Bone-Club criteria. The Momah court opined that "the [Waller] Court required a showing that the defendant's case was actually rendered unfair by the closure." Momah, 167 Wash.2d at 150, 217 P.3d 321.
¶ 12 In Strode, Momah's companion case, the lead opinion reiterated and applied Orange's conclusionthat the trial court must employ the Bone-Club criteria before any courtroom closure and the failure to employ that criteria is reversible error. See 167 Wash.2d at 227-28, 217 P.3d 310. But Strode was a plurality decision published the same day as Momah, thus leaving unclear whether the Bone-Club criteria was a prerequisite for courtroom closure.[6]See Paumier, 155 Wash.App. at 679-83, 230 P.3d 212.
¶ 13 Shortly after Momah and Strode were issued, the United States Supreme Court decided Presley v. Georgia, ___ U.S. ___, 130 S.Ct. 721, 175 L.Ed.2d 675 (2010), holding that under the First and Sixth Amendments, voir dire of prospective jurors must be open to the public and that this requirement is "binding on the States." Presley, 130 S.Ct. at 723. See also Paumier, 155 Wash.App. at 683-86, 230 P.3d 212. Presley made clear that Waller provided the appropriate standards for courts to apply before excluding the public from any stage of a criminal trial. Presley, 130 S.Ct. at 724.
¶ 14 Noting that "[t]rial courts are obligated to take every reasonable measure to accommodate public attendance at criminal trials," Presley, 130 S.Ct. at 725, the Court reiterated that "`[a]bsent consideration of alternatives to closure, the trial court could not constitutionally close the voir dire.'" Presley, 130 S.Ct. at 724 (quoting Press-Enterprise Co. v. Superior Court of Cal., Riverside County, 464 U.S. 501, 511, 104 S.Ct. 819, 78 L.Ed.2d 629 (1984)). Moreover "trial courts are required to consider alternatives to closure even when they are not offered by the parties," this is because "[t]he public has a right to be present whether or not any party has asserted the right." Presley, 130 S.Ct. at 724-25. Additionally, the trial court must make appropriate findings supporting its decision to close the proceedings. Presley, 130 S.Ct. at 725.
¶ 15 Presley held that "even assuming, arguendo, that the trial court had an overriding interest in closing voir dire, it was still incumbent upon it to consider all reasonable alternatives to closure." Presley, 130 S.Ct. at 725. Thus, where the trial court fails to sua sponte consider reasonable alternatives and fails to make the appropriate findings, the proper remedy is reversal of the defendant's conviction. Presley, 130 S.Ct. at 725. As we held in Paumier, "Presley, applying the federal constitution, resolves any question about what a trial court must do before excluding the public from trial proceedings, including voir dire." Paumier, 155 Wash. App. at 685, 230 P.3d 212.
¶ 16 In his supplemental briefing, Leyerle, as did Paumier, argues that his case is factually more like Strode than it is like Momah. The State contends otherwise. Such debate is of no significance, however, because as we acknowledged in Paumier, Presley has eclipsed Momah and Strode and controls the outcome of this case.[7]
*804 ¶ 17 The State contends that Leyerle waived any courtroom closure issue when defense counsel acknowledged that Leyerle did not wish to be present during the prospective juror's interview in the hallway. We disagree. As our Supreme Court reiterated in Strode, "a `defendant's failure to lodge a contemporaneous objection at trial [does] not effect a waiver.'" 167 Wash.2d at 229, 217 P.3d 310 (alteration in original) (quoting Brightman, 155 Wash.2d at 517, 122 P.3d 150). "[Defendant]'s failure to object to the closure or his counsel's participation in closed questioning of prospective jurors did not ... constitute a waiver of his right to a public trial."[8]Strode, 167 Wash.2d at 229, 217 P.3d 310.
¶ 18 Additionally, a defendant "cannot waive the public's right to open proceedings." Strode, 167 Wash.2d at 229, 217 P.3d 310. This is so because "the public also has a right to object to the closure of a courtroom, and the trial court has the independent obligation to perform a Bone-Club analysis." Strode, 167 Wash.2d at 229-30, 217 P.3d 310. "The public has a right to be present whether or not any party has asserted the right," thus trial courts are required to consider alternatives to closure even when the parties do not offer such alternatives. Presley, 130 S.Ct. at 724-25.
¶ 19 The State also contends, and the dissent agrees, that "[t]here is nothing to indicate that the hallway was not open to the public" and thus "there was no closure." Supp. Br. of Resp't at 1; Dissent at 805-06. But we have held that "conducting voir dire out of the courtroom constitutes a `closure' that mandates Bone-Club analysis even when the trial court has not explicitly closed the proceedings." State v. Heath, 150 Wash. App. 121, 127, 206 P.3d 712 (2009) (citing State v. Erickson, 146 Wash.App. 200, 211, 189 P.3d 245 (2008)); see also State v. Frawley, 140 Wash.App. 713, 720, 167 P.3d 593 (2007). But see State v. Momah, 141 Wash. App. 705, 714, 171 P.3d 1064 (2007) (Division One holding that conducting voir dire outside of the courtroom absent an explicit order does not constitute a "closure"), aff'd on other grounds, 167 Wash.2d 140, 217 P.3d 321 (2009); State v. Wise, 148 Wash.App. 425, 436, 200 P.3d 266 (2009) (trial court was not required to sua sponte conduct Bone-Club analysis before temporary relocation of voir dire to chambers for the purpose of asking prospective jurors sensitive questions). While there is disagreement among the noted decisions, Heath, Erickson, Frawley, and Duckett comport with Presley, and we adhere to those decisions.
¶ 20 Finally, the State contends, and the dissent agrees, that any violation here of the public trial right was de minimis. Dissent at 806 n. 13. Again, we disagree. As we previously stated in Erickson:
We agree with the principle stated in [State v.] Duckett that "the guaranty of a public trial under our constitution has never been subject to a de minim[i]s exception." 141 Wash.App. [797] at 809 [173 P.3d 948 (2007)]. Even though one can articulate pragmatic and salutary reasons for moving voir dire outside the courtroom in certain circumstances, such a course of action requires the trial court to engage in a Bone-Club inquiry before doing so.
Erickson, 146 Wash.App. at 211, 189 P.3d 245. Similarly, our Supreme Court observed in Strode that it "`has never found a public trial right violation to be [trivial or] de minimis.'" 167 Wash.2d at 230, 217 P.3d 310 (alterations in original) (quoting Easterling, 157 Wash.2d at 180, 137 P.3d 825). See also Presley, 130 S.Ct. at 724-25 (It is the trial court's obligation to take every reasonable measure to accommodate public attendance at criminal trials, and absent that court's consideration of alternatives to closure, it could not constitutionally close voir dire.).
*805 ¶ 21 As we held in Paumier, "Presley, applying the federal constitution, resolves any question about what a trial court must do before excluding the public from trial proceedings, including voir dire." Paumier, 155 Wash.App. at 685, 230 P.3d 212. Similar to what occurred in Paumier, the trial court here conducted a portion of voir dire outside the public forum of the courtroom. By doing so, without first considering alternatives to such closure of this portion of the voir dire proceedings and making appropriate findings explaining why such closure was necessary, the trial court violated Leyerle's and the public's right to an open proceeding. Presley requires reversal of Leyerle's conviction for unlawful possession of methamphetamine, and we so hold.
¶ 22 We reverse Leyerle's conviction and remand for further proceedings consistent with this opinion.[9]
I concur: BRIDGEWATER, P.J.
HUNT, J. (dissenting).
¶ 23 I respectfully dissent. On the record before us, I would hold that the separate voir dire of this one prospective juror was not closed to the public. But even if the majority is correct that this voir dire was closed to the public, I would hold that interviewing this sole biased juror for two minutes in the hall outside the courtroom, away from the rest of the venire, does not warrant a new trial because it served the basic purposes of the right to a public trial: to ensure "a fair trial, foster public understanding and trust in the judicial system, and give judges the check of public scrutiny." Majority at 802 (citing State v. Brightman, 155 Wash.2d 506, 514, 122 P.3d 150 (2005)). I would affirm.

I. Single Juror Voir Dire Not Closed To Public
¶ 24 Acknowledging that the trial court did not "explicitly close[] the proceedings," the majority nevertheless concludes that the trial court closed the juror voir dire to the public, Majority at 804 (quoting State v. Heath, 150 Wash.App. 121, 127, 206 P.3d 712 (2009)(citing State v. Erickson, 146 Wash.App. 200, 211, 189 P.3d 245 (2008)); and State v. Frawley, 140 Wash.App. 713, 720, 167 P.3d 593 (2007)). I disagree. Furthermore, although like the trial court here, the Heath, Erickson, and Frawley trial courts did not expressly close voir dire to the public, these three cases are distinguishable from this case.
¶ 25 Frawley and Heath involved voir dire of individual jurors in the judge's chambers. Frawley, 140 Wash.App. at 718, 167 P.3d 593; Heath, 150 Wash.App. at 124-25, 206 P.3d 712. In Erickson, the trial court conducted voir dire of individual jurors in the jury room after clearing the courtroom of all other prospective jurors. Erickson, 146 Wash.App. at 204, 189 P.3d 245. A judge's chambers and the jury room are usually private locations; thus, at most Heath, Erickson, and Frawley stand for the proposition that, even if the trial court does not explicitly close jury voir dire to the public, the voir dire is considered closed to the public if the trial court relocates the voir dire to a location typically considered private. In contrast, a public hallway outside a courtroom, such as the location of the short voir dire here, is not ordinarily considered private. Therefore, I respectfully disagree that Heath, Erickson, and Frawley control the outcome of Leyerle's case.
¶ 26 In my view, we should instead examine the particular facts of Leyerle's case to determine whether there was in fact a court closure, just as the United States Supreme Court has done in previous cases involving alleged violations of the right to a public trial.[10] Here, the record establishes that there was no member of the public in the courtroom when the trial court moved the single juror voir dire into the public hallway, *806 See I Verbatim Report of Proceeding (VRP) at 19; similarly, nothing in the record even hints that any member of the public entered the courtroom during this two-minute interview or was excluded from the hallway voir dire.
¶ 27 In further contrast with Heath, Erickson, and Frawley, the trial court here video-taped the juror interview, transcribed its four pages of the Verbatim Report of Proceedings, and made it available for review by the public together with the rest of the trial record. See I VRP at 19. Moreover, both counsel were present during this video-taped voir dire, together with the trial court and the sole prospective juror. I VRP at 19. Leyerle was not excluded; rather, he chose to stay in the courtroom on the recommendation of his counsel. I VRP at 20.
¶ 28 These undisputed facts show that this short single juror voir dire took place in a public setting. Accordingly, I disagree with the majority's conclusion that a court closure occurred in this case and I would uphold the trial court's action on this factual ground alone.

II. Leyerle Is Not Entitled To A New Trial
¶ 29 Assuming, however, without agreeing, that the voir dire of this single juror was closed to the public as a matter of law, see Majority at 804, I do not agree with the majority that Leyerle is automatically entitled to a new trial simply because the trial court did not recite the Bone-Club factors[11] on the record.
¶ 30 Nor do I agree with the bright-line rule that the majority advances: "[W]here the trial court fails to sua sponte consider reasonable alternatives and fails to make the appropriate findings, the proper remedy is reversal of the defendant's conviction." Majority at 803 (citing Presley, 130 S.Ct. at 725). With all due respect, the cases on which the majority relies, Waller, Presley, and Paumier,[12] do not support this bright-line approach. Instead, the case law embraces a case-by-case approach that requires a "remedy ... appropriate to the violation," Waller, 467 U.S. at 50, 104 S.Ct. 2210, which does not automatically involve reversal.[13] Under this case-by-case approach, Leyerle is not entitled to a new trial.
¶ 31 In addition to lacking case law support, in my view, the majority's approach is neither prudent nor necessary to advance the cause of justice. As the United States Supreme Court noted in Waller, the unnecessary grant of a new trial may create a "windfall for the defendant," which is "not in the public interest." Waller, 467 U.S. at 50, 104 S.Ct. 2210. Such windfalls consume scarce judicial resources without providing any corresponding benefit to the public or to defendants who have already received fair trials. Furthermore, unnecessary new trials undermine "public understanding and trust in the judicial system" a core value inherent in the right to a public trial. Majority at 3 (citing Brightman, 155 Wash.2d at 514, 122 P.3d 150).

A. Waller

¶ 32 In Waller, the United States Supreme Court held that the appropriate relief for violating a defendant's right to a public trial under the Sixth Amendment of the United States Constitution is not an automatic grant of a new trial. See Waller, 467 U.S. at 49-50, 104 S.Ct. 2210. As I noted above, "[r]ather, the remedy should be appropriate to the *807 violation." Waller, 467 U.S. at 50, 104 S.Ct. 2210.
¶ 33 The Sixth Amendment violation in Waller was grounded in the closure of the courtroom to the public during a suppression hearing, which closure the prosecution requested, and the trial court granted, over the defendant's objection. The suppression hearing lasted seven days, but only a fraction of that time dealt with the issue that had prompted the prosecution's closure request; most of the suppression hearing addressed other issues. See Waller, 467 U.S. at 41-43, 104 S.Ct. 2210.
¶ 34 The United States Supreme Court ruled that the court closure was not warranted because: (1) the state's interest in closure was unduly vague; (2) the trial court failed to consider alternatives to the closure; and (3) the closure was excessively long. Waller, 467 U.S. at 48-49, 104 S.Ct. 2210. Announcing that "the remedy should be appropriate to the violation," the United States Supreme Court refused Waller's request for a new trial to mitigate violation of his constitutional right to a public trial. Waller, 467 U.S. at 50, 104 S.Ct. 2210. The Waller court reasoned that a properly conducted suppression hearing conducted in open court would, at most, have resulted in the suppression of the evidence; therefore, "a new trial presumably would be a windfall for the defendant, and not in the public interest." Waller, 467 U.S. at 50, 104 S.Ct. 2210. Consistent with its "remedy ... appropriate to the violation" standard, the United States Supreme Court ordered only a new suppression hearing, with the instruction to the trial court to decide "what portions, if any, may be closed." Waller, 467 U.S. at 50, 104 S.Ct. 2210.
¶ 35 If we apply Waller's case-by-case approach here, Leyerle is not entitled to a new trial because the "windfall" remedy of a new trial is not "appropriate to the violation"[14]: The alleged exclusion of the public from a two-minute voir dire of a potentially biased juror, ultimately excused for cause to ensure a unbiased jury for Leyerle, does not require a new trial. What wrong or prejudice did this two-minute hallway voir dire cause for Leyerle or the public that only a new trial can correct? How could a new trial, without this two-minute voir dire of a biased juror out of earshot of the venire, actually produce a fairer trial for Leyerle or a more open trial for the public?
¶ 36 Unlike in Waller, (1) Leyerle did not object to the purported courtroom closure; (2) the need for the alleged closurebias of a potential jurorwas clearly articulated (in contrast to the nebulous concerns the Waller trial court cited); (3) there are no facts in the record suggesting that the courtroom itself was ever closed to the public; and (4) the single juror voir dire occurred in a public hallway and was recorded via videocamera, a transcription of which is available for public review. See I VRP 18-22. If the United States Supreme Court refused to grant Waller a new trial to remedy an actual courtroom closure and exclusion of the public for seven days, only a fraction of which was necessary, how can the majority justify a new trial to "remedy[15]" the two-minute hallway interview to ferret out a biased juror here?

B. Presley

¶ 37 Presley did not explicitly overrule or undermine sub silentio any part of Waller. The United States Supreme Court's grant of a new trial for Presley does not necessarily mean that the Presley court refused to apply Waller's "remedy ... appropriate to the relief" standard.[16] On the contrary, Presley applied the Waller standard, but reached a different outcome because the Presley facts differed from those in Waller.
¶ 38 Over Presley's objection, the trial court closed the courtroom for the entire voir dire. Presley, 130 S.Ct. at 722. Citing concerns about the public "overhear[ing] some inadvertent comment or conversation" and concerns about having enough courtroom seats for the potential jury members, the trial court ordered the only present member of the public, Presley's uncle, to leave the courtroom before voir dire commenced. *808 Presley, 130 S.Ct. at 722. The United States Supreme Court reversed and remanded for a new trial, holding that the trial court had violated Presley's Sixth Amendment right to a public trial. Presley, 130 S.Ct. at 725. In so doing, the Supreme Court admonished the trial court for failing to "consider alternatives to closure even when they are not offered by the parties" and even offered up some alternatives of its own. See Presley, 130 S.Ct. at 725. The Presley court also noted that the trial court's concern about the "generic risk of jurors overhearing prejudicial remarks" was too tenuous to support the closure of the entire voir dire to the public. See Presley, 130 S.Ct. at 725.
¶ 39 Although, unlike in Waller, the United States Supreme Court ordered a new trial for Presley, it did not announce that a new trial is automatically required every time a courtroom closure occurs simply because the trial court did not consider alternatives to closure on the record. The Presley court stated, in essence:
[It is] incumbent upon [the trial court] to consider all reasonable alternatives to closure.... [Here, the trial court] did not, and that is all this Court needs to decide.
Presley, 130 S.Ct. at 725. This statement about the factual failures in Presley's case, however, neither creates nor equates to a bright-line rule that, in all future cases, a new trial is necessary every time a trial court fails to articulate the Bone-Club factors on the record.
¶ 40 The United States Supreme Court held that a new trial was appropriate for Presley because he had objected to the trial court's excluding his uncle from the courtroom for proffered questionable reasonsto allow room for more jurors and to avoid jurors overhearing remarks by Presley's uncle. Presley, 130 S.Ct. at 725. But the Presley court did not purport to extend its holding to cases lacking comparable justifying facts, such as the case before us, where not only did Leyerle not object to the short hallway voir dire of the single juror, but the record before us shows that the hallway voir harmed neither Leyerle nor the public in any way. The utter lack of prejudice here is especially noteworthy in light of the publicly accessible videotape of the interview, which worked to Leyerle's clear advantage when it resulted in excusal for cause of a biased juror whom the trial court had carefully insulated from the remaining potential jurors.
¶ 41 Furthermore, Presley did not explicitly disturb any aspect of Waller, including Waller's previously mentioned "remedy ... appropriate to the violation[17]" standard; on the contrary, Presley repeatedly cited Waller approvingly. See, e.g., Presley, 130 S.Ct. at 724. We should treat Presley as having left intact Waller's case-by-case approach to remedies for unjustified courtroom closures. See Agostini v. Felton, 521 U.S. 203, 207, 117 S.Ct. 1997, 138 L.Ed.2d 391 (1997) (warning other courts to refrain from assuming the United States Supreme Court has implicitly overruled its prior cases).
¶ 42 Comparing the facts in Presley with those here, Leyerle is not entitled to a new trial. The trial court left Leyerle's courtroom open to the public, left the jury venire in the courtroom, and took only the one juror who said he could not be fair into the apparently public hallway outside the courtroom for a two-minute colloquy, during which no member of the public was excluded; furthermore, the colloquy was videotaped and preserved for public review. See I VRP 18-22. And unlike Presley, who objected to the trial court's courtroom closure during voir dire of all the jurors[18], Leyerle assented to the hallway interview of this one juror.[19] Based on these significantly different facts, Presley does not require automatic reversal and a new trial for Leyerle.

*809 C. Paumier

¶ 43 A different panel of our court decided Paumier earlier this year.[20] The majority here relies on the Paumier majority's reading of Presley as requiring the automatic grant of a new trial whenever a trial court fails to articulate the Bone-Club factors on the record before closing the courtroom or excluding a member of the public from any portion of the trial proceedings. See Majority at 801-02 (citing Paumier, 155 Wash.App. at 673, 230 P.3d 212). I disagree with the Paumier majority's effectively reading Presley as overruling Waller's requirement that the remedy be appropriate to the violation and that the reviewing court analyze the circumstances of the closure before requiring remand. See Paumier, 155 Wash.App. at 685, 230 P.3d 212. In my view, Judge Quinn-Brintnall accurately distinguishes Presley in her Paumier dissent on the grounds that, unlike Paumier, who did not object, Presley had expressly objected to the exclusion of his uncle from the courtroom during voir dire. 155 Wash.App. at 688, 230 P.3d 212. Although lacking in precedential value, I adopt Judge Quinn-Brintnall's dissenting rationale in Paumier to my dissent here for similar reasons.
¶ 44 In my view, the following statement of two of my learned colleagues in the Paumier majority improvidently inflates the United States Supreme Court's holding in Presley: "Thus, where the trial court fails to sua sponte consider reasonable alternatives and fails to make the appropriate findings, the proper remedy is reversal of the defendant's conviction." Paumier, 155 Wash.App. at 685, 230 P.3d 212 (citing Presley, 130 S.Ct. at 725). With all due respect, my reading of Presley does not support such inflation. If Presley created a bright-line rule, then Waller's "remedy ... appropriate to the violation"[21] standard would necessarily have to be overruled. Yet Paumier (and the majority here) did not explain how Presley explicitly overruled or implicitly undermined Waller, a case which Presley repeatedly cited with approval. In fact, the United States Supreme Court:
[has not] acknowledge[d], ... nor [held] that other courts should [] conclude [our] more recent cases have, by implication, overruled an earlier precedent.... Rather, [if a precedent of this Court has direct application in a case, yet appears to rest on reasons rejected in some other line of decisions] lower courts should follow the case which directly controls, leaving to this Court the prerogative of overruling its own decisions.
Agostini, 521 U.S. at 207, 117 S.Ct. 1997 (emphasis added) (internal citation omitted).
¶ 45 In addition, Paumier is distinguishable from Leyerle's case. First, the Paumier trial court allowed voir dire of several potential jurors in the judge's chambers, an area apparently not open to the public.[22] Here, in contrast, the trial court did not voir dire the one juror in a private area such as the judge's chambers or some other area apparently closed off to the public; rather, it conducted the short voir dire in the apparently public hallway outside the courtroom. In addition, the trial court here videotaped the two-minute interview, making the individual juror voir dire part of the public record. See I VRP at 19.
¶ 46 Furthermore, it is important to note that the two-judge Paumier majority reversed and remanded for a new trial based, not only on the courtroom closure, but also on the trial court's abuse of discretion in denying Paumier's request to represent himself. Paumier, 155 Wash.App. at 686-88, 230 P.3d 212. Such is not the case here.

*810 D. Momah[23] and Strode[24]
¶ 47 As the Paumier majority acknowledges, in Momah the Washington Supreme Court explained that a "structural" error requires automatic reversal and a new trial. Paumier, 155 Wash.App. at 681, 230 P.3d 212 (citing Momah, 167 Wash.2d at 149, 217 P.3d 321). An error is structural in nature when "it necessarily renders a criminal trial fundamentally unfair or an unreliable vehicle for determining guilt or innocence." Momah, 167 Wash.2d at 149, 217 P.3d 321 (internal citation and quotation omitted). Again, such is not the case here.
¶ 48 The issue in Momah was whether a closed voir dire session constituted a structural error. Momah, 167 Wash.2d at 151-52, 217 P.3d 321. The Momah court held that it was not. Momah, 167 Wash.2d at 152, 217 P.3d 321. Momah "affirmatively assented to the closure, argued for its expansion, had the opportunity to object but did not, actively participated in it, and benefited from it." Momah, 167 Wash.2d at 151, 217 P.3d 321. Additionally,
and perhaps most importantly, the trial judge closed the courtroom to safeguard Momah's constitutional right to a fair trial by an impartial jury, not to protect any other interests.
Momah, 167 Wash.2d at 151-52, 217 P.3d 321 (emphasis added). For these reasons, the Supreme Court held that the closed voir dire session was not structural error in Momah. 167 Wash.2d at 151-52, 217 P.3d 321.
¶ 49 Here, as in Momah, there are no facts suggesting that the hallway juror interview "render[ed] [Leyerle's] criminal trial fundamentally unfair or an unreliable vehicle for determining guilt or innocence." Momah, 167 Wash.2d at 149, 217 P.3d 321. On the contrary, because the trial court excused this juror for cause following voir dire, at Leyerle's request,[25] the hallway interview protected and enhanced the fundamental fairness of Leyerle's trial, just as the voir dire protected Momah from jurors with prejudice against him. Momah, 167 Wash.2d at 151-52, 217 P.3d 321.
¶ 50 The Paumier majority also cited "Strode, a plurality decision released the same day as Momah," to support the following observation, which, ironically appears to accept Waller's case-by-case approach rather than a bright-line rule of automatic reversal:

[D]espite Momah, it appears that six justices agree that a Bone-Club analysis (or some equivalent) is required prior to closing the courtroom. What was not clear after Momah and Strode is what the appropriate remedy should be when Bone-Club guidelines are not employed prior to closure. Apparently, the reviewing court is to look to the record to see if the trial court employed some equivalent of Bone-Club and then fashion[ed] a remedy appropriate to the violation if the trial court failed to engage in an adequate inquiry.

Paumier, 155 Wash.App. at 683, 230 P.3d 212 (emphasis added).
¶ 51 I strongly agree with the majority in Paumier, as our Washington Supreme Court noted in Momah, that it is a "better practice" for the trial court to articulate on the record its consideration of each Bone-Club factor and its reason for closing the courtroom. Paumier, 155 Wash.App. at 680, 230 P.3d 212 (citing Momah, 167 Wash.2d at 151 n. 2, 217 P.3d 321). Nevertheless, an automatic reversal of Leyerle's conviction is not warranted simply because the trial court's partial articulation of its reasons here fell short of formulating all of the Bone-Club factors. Nor does the case law so require. It is undisputed that the short voir dire of the biased juror in the hallway advanced and protected Leyerle's right to trial by an impartial jury, especially when it resulted in preventing him from tainting the rest of the venire with the following exchange:
[Biased Juror]: To be very candid with you. I am prejudicial towards the officers involved. I've spent too much time on the other sideI'm already biased for the other *811 side and I can't help it. I've just spent too much time in that environment.
JUDGE STONIER: And you feel that this wouldit would be difficult to be fair in this case, is that correct?
[Biased Juror]: Well, let's put it this way, I wouldn't take the evidenceI wouldn't take the evidence evenly on both sides. I would be prejudicial towards the law enforcement side.
JUDGE STONIER: So you would tend to believe them if they testified?
[Biased Juror]: I mean, I tend to believe it already and I haven't even heard the testimony. And I'm sorry about that, Judge. I mean I didn't' want to ... I didn't want to contaminate your jury pool.
I VRP (Nov. 16, 2007) at 19-20. Because of these statements, the trial court granted Leyerle's request to excuse this biased juror for cause. See I VRP at 21. Thus, the only effect of the hallway interview was to preserve Leyerle's fundamental right to trial by an impartial jury, a right that the Sixth Amendment protects in addition to the right to a public trial. See Brightman, 155 Wash.2d at 514, 122 P.3d 150; Momah, 167 Wash.2d at 152, 217 P.3d 321.
¶ 52 I would hold that the trial court here properly exercised its discretion to protect both constitutional rights, properly making paramount Leyerle's fundamental right to a fair trial by an impartial jury. Questioning one biased juror for two minutes in the hallway, with Leyerle's assent, violated no constitutional right, while it protected the most basic of his constitutional rights. That in so doing the trial court did not articulate on the record all of the Bone-Club factors neither requires nor merits reversal and a new trial. I strongly, but respectfully, disagree with the majority's reversal of Leyerle's conviction based on a technicality that advanced, rather than thwarted, justice. Again, I would affirm.
NOTES
[1] The trial court dismissed a second charge and that determination is not before us on appeal.
[2] The means of this recording is not in the record but the parties explained at oral argument that events in a hallway can be videotaped and audio recorded.
[3] On November 21, 2008, we ordered proceedings stayed pending our Supreme Court's decisions in State v. Strode, No. 80849-0, and State v. Momah, No. 81096-6, addressing the public trial issue. On October 8, 2009, our Supreme Court issued its decisions in State v. Strode, 167 Wash.2d 222, 217 P.3d 310 (2009) and State v. Momah, 167 Wash.2d 140, 217 P.3d 321 (2009). We lifted the stay on October 29, 2009, and ordered the parties to provide supplemental briefing on the impact of Strode and Momah on this case. The parties have provided that briefing and we now consider Leyerle's appeal.
[4] The Bone-Club analysis provides:

"1. The proponent of closure or sealing must make some showing [of a compelling interest], and where that need is based on a right other than an accused's right to a fair trial, the proponent must show a serious and imminent threat to that right.
2. Anyone present when the closure motion is made must be given an opportunity to object to the closure.
3. The proposed method for curtailing open access must be the least restrictive means available for protecting the threatened interests.
4. The court must weigh the competing interests of the proponent of closure and the public.
5. The order must be no broader in its application or duration than necessary to serve its purpose."
128 Wash.2d at 258-59, 906 P.2d 325 (alteration in original) (internal quotation marks omitted) (quoting Allied Daily Newspapers of Wash. v. Eikenberry, 121 Wash.2d 205, 210-11, 848 P.2d 1258 (1993)).
[5] The Waller standards require:

[T]he party seeking to close the hearing must advance an overriding interest that is likely to be prejudiced, the closure must be no broader than necessary to protect that interest, the trial court must consider reasonable alternatives to closing the proceeding, and it must make findings adequate to support the closure.
Waller, 467 U.S. at 48, 104 S.Ct. 2210.
[6] presumption that trials should be open may be overcome "only by an overriding interest based on findings that closure is essential to preserve higher values and is narrowly tailored to serve that interest. The interest is to be articulated along with findings specific enough that a reviewing court can determine whether the closure order was properly entered." To assure careful, case-by-case analysis of a closure motion, a trial court faced with the question of whether a portion of a trial should be closed must ensure that the ... five [Bone-Club] criteria are satisfied.
Strode, 167 Wash.2d at 227, 217 P.3d 310 (citations omitted) (internal quotation marks omitted) (quoting Orange, 152 Wash.2d at 806, 100 P.3d 291).
[7] As our Supreme Court has observed in another context, "[United States] Supreme Court application of the United States Constitution establishes a floor below which state courts cannot go." State v. Sieyes, 168 Wash.2d 276, 292, 225 P.3d 995 (2010) (addressing the right to bear arms under article I, section 24 of the Washington State Constitution and the Second Amendment). That tenet applies equally here.
[8] Moreover, a defendant's right to a public trial can be waived only in a "knowing, voluntary, and intelligent manner." Strode, 167 Wash.2d at 229 n. 3, 217 P.3d 310. Here, the record is silent about whether a colloquy, writing, or other personal expression by Leyerle indicated that he knowingly, voluntarily, and intelligently waived his right to participate in voir dire of the prospective juror. While such failure would apparently provide yet another basis for reversing Leyerle's conviction, we need not address that matter in light of our determination that Presley's requirements resolve this case.
[9] We would normally order a new trial, but because the parties indicated at oral argument that they did not know whether Leyerle is still in custody on this conviction, we leave to the parties the pursuit of further proceedings as appropriate, which may include, for example, a new trial or a plea and credit for time served.
[10] See Waller v. Georgia, 467 U.S. 39, 41-43, 48-49, 104 S.Ct. 2210, 81 L.Ed.2d 31 (1984) (noting inter alia the duration of the court closure, which parties objected to the closure, and the parties excluded from the closure); see also Presley v. Georgia, ___ U.S. ___, 130 S.Ct. 721, 722, 175 L.Ed.2d 675 (2010).
[11] State v. Bone-Club, 128 Wash.2d 254, 258-59, 906 P.2d 325 (1995).
[12] State v. Paumier, 155 Wash.App. 673, 230 P.3d 212 (2010), review granted, 169 Wash.2d 1017, 236 P.3d 206 (2010).
[13] I do agree with the majority that Presley holds that Waller articulates the appropriate standard for a trial court to apply when deciding whether to close any portion of a criminal trial to the public. See Majority at 6. See also Waller, 467 U.S. at 45, 104 S.Ct. 2210 ("The presumption of openness may be overcome only by an overriding interest based on findings that closure is essential to preserve higher values and is narrowly tailored to serve that interest. The interest is to be articulated along with findings specific enough that a reviewing court can determine whether the closure order was properly entered.") (quoting Press-Enterprise Co. v. Superior Court of California, Riverside County, 464 U.S. 501, 104 S.Ct. 819, 78 L.Ed.2d 629 (1984)); see also Bone-Club, 128 Wash.2d at 260, 906 P.2d 325 (adopting the Waller standard).
[14] Waller, 467 U.S. at 50, 104 S.Ct. 2210.
[15] Waller, 467 U.S. at 50, 104 S.Ct. 2210.
[16] Waller, 467 U.S. at 50, 104 S.Ct. 2210.
[17] Waller, 467 U.S. at 50, 104 S.Ct. 2210.
[18] Presley, 130 S.Ct. at 722.
[19] Concerned about the Bone-Club factors in relation to the hallway juror voir dire, the State asked the trial court to clarify on the record that no spectators were present and Leyerle had waived his right to be present. See I VRP at 19. The trial court responded, "[T]here were no spectators who waived their right to be here so in this [case] it is easy so long as Mr. Leyerle doesn't want to be here and his counsel said [he] didn't want to be here. Isn't that correct?" Leyerle's counsel responded, "Yes, Your Honor." I VRP at 20.
[20] Judge Bridgewater wrote the majority opinion in Paumier, in which former Judge Houghton concurred. Judge Quinn-Brintnall filed a dissenting opinion.
[21] Waller, 467 U.S. at 50, 104 S.Ct. 2210.
[22] In Paumier:

The trial court stated at the outset that potential jurors who preferred to answer questions privately to avoid possible embarrassment would be taken into the judge's chambers. Several jurors indicated during the course of voir dire that they preferred to answer certain questions in chambers. The judge and the parties questioned five jurors in chambers, recording the jurors' responses. Jury selection was completed that same day.
Paumier, 155 Wash.App. at 676, 230 P.3d 212 (footnote omitted).
[23] State v. Momah, 167 Wash.2d 140, 217 P.3d 321 (2009), cert. denied, ___ U.S. ___, ___ S.Ct. ___, ___ L.Ed.2d ___, 78 U.S.L.W. 3745 (2010).
[24] State v. Strode, 167 Wash.2d 222, 217 P.3d 310 (2009).
[25] I VRP at 21.