230 P.3d 212 (2010)
STATE of Washington, Respondent,
v.
Rene P. PAUMIER, Appellant.
No. 36346-1-II.
Court of Appeals of Washington, Division 2.
April 27, 2010.
*214 Eric J. Nielsen, Andrew Peter Zinner, Nielsen Broman & Koch, PLLC, Seattle, WA, for Appellant.
Edward P. Lombardo, Mason County Prosecuting Attorney's Office, Shelton, WA, for Respondent.
BRIDGEWATER, J.
¶ 1 Rene Paumier appeals his convictions for residential burglary and third degree theft. Because we hold that the trial court improperly excluded the public from a portion of Paumier's trial and improperly denied his right to represent himself, we reverse his convictions and remand for further proceedings.

Facts
¶ 2 When Jason Howland returned home after a weekend outing, he discovered that the back door to his residence had been broken open and that several items had been taken from his bedroom, including three knives, two watches, belt buckles, baseball hats, and other clothing items. He called police, who began an investigation regarding the burglary.
¶ 3 Police became interested in Paumier after they interviewed a neighbor who reported having seen Paumier during the weekend of the burglary exit the front of Howland's house and walk down the street. A police officer contacted Paumier, advised him why he wanted to speak with him, read Paumier his Miranda[1] warnings, and requested to search his person and the backpack he was carrying. Paumier consented to being searched, and police found a knife and a belt buckle that Howland identified as having come from his bedroom. The State ultimately charged Paumier with residential burglary and second degree theft.
¶ 4 Following the trial court's rulings on motions in limine, jury selection began on May 8, 2007. The trial court stated at the outset that potential jurors who preferred to answer questions privately to avoid possible embarrassment would be taken into the judge's chambers. Several jurors indicated during the course of voir dire that they preferred to answer certain questions in chambers. The judge and the parties questioned five jurors in chambers, recording the jurors' responses.[2] Jury selection was completed that same day.
¶ 5 The following day, the trial court permitted the State to amend the information. 1 RP at 8. Paumier then pleaded not guilty and asked to represent himself, stating:
I just don't feel like aI feel like there's [sic] things about the trial getting this far that it shouldn't have. And I feel that my attorney should have spoke [sic] up for me instead of getting pissed off at me in court. And I just don't feel like he's doing his job like he should. I don't feel it should have gotten this far, and I'd just rather present my, you know, case myself.
1 RP at 9. The court denied the request noting that it came too late. "We have already picked our jury and we're ready to begin trial at this point, and the Court will find that the request is untimely." 1 RP at 9.
¶ 6 Following trial, the jury found Paumier guilty of residential burglary and the lesser included offense of third degree theft. The court sentenced Paumier to 25 months in prison for the burglary and 365 days in jail *215 for the theft, suspending the theft sentence upon compliance with a 24-month probation term.
¶ 7 Paumier appealed, arguing that his right to a public trial had been violated and that the trial court improperly denied his request to proceed pro se. On May 1, 2008, we ordered proceedings stayed pending our Supreme Court's decision in State v. Strode, no. 80849-0, addressing the public trial issue. On October 8, 2009, our Supreme Court issued its decision in State v. Strode, 167 Wash.2d 222, 217 P.3d 310 (2009), along with a companion case, State v. Momah, 167 Wash.2d 140, 217 P.3d 321 (2009).[3] We lifted the stay on November 3, 2009, and ordered the parties to provide supplemental briefing on the impact of Strode and Momah on this case. The parties have provided that briefing and we now consider Paumier's appeal.

Discussion

Public Trial Right
¶ 8 Paumier argues that by conducting a portion of the jury selection in the privacy of chambers the trial court violated his constitutional right to a public trial. We agree.
¶ 9 The state and federal constitutions guarantee the right to a public trial. Article I, section 22 of the Washington Constitution provides: "In criminal prosecutions the accused shall have the right . . . to have a speedy public trial." The Sixth Amendment to the United States Constitution states: "In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial." Moreover, article I, section 10 of the Washington Constitution provides that "[j]ustice in all cases shall be administered openly, and without unnecessary delay." This provision secures the public's right to open and accessible proceedings. State v. Easterling, 157 Wash.2d 167, 174, 137 P.3d 825 (2006). These provisions assure a fair trial, foster public understanding and trust in the judicial system, and give judges the check of public scrutiny. State v. Brightman, 155 Wash.2d 506, 514, 122 P.3d 150 (2005); Dreiling v. Jain, 151 Wash.2d 900, 903-04, 93 P.3d 861 (2004). While the public trial right is not absolute, it is strictly guarded to assure that proceedings occur outside the public courtroom in only the most unusual circumstances. Easterling, 157 Wash.2d at 174-75, 137 P.3d 825; Brightman, 155 Wash.2d at 509, 122 P.3d 150; In re Pers. Restraint of Orange, 152 Wash.2d 795, 804-05, 100 P.3d 291 (2004); State v. Bone-Club, 128 Wash.2d 254, 258-59, 906 P.2d 325 (1995).
¶ 10 The guaranty of open criminal proceedings extends to voir dire. Orange, 152 Wash.2d at 804, 100 P.3d 291. In Bone-Club and Orange, our Supreme Court set out the standards for closing all or any portion of a criminal trial. Bone-Club, 128 Wash.2d at 258-59, 906 P.2d 325; Orange, 152 Wash.2d at 805, 100 P.3d 291. Bone-Club adopted a five-part analysis designed to protect a criminal defendant's right to a public trial.[4]Bone-Club, 128 Wash.2d at 258-60, 906 P.2d 325; see also Seattle Times Co. v. Ishikawa, 97 Wash.2d 30, 36-39, 640 P.2d 716 (1982) (setting forth five-part analysis under article I, section 10). Relying on these cases, Division Three held in State v. Duckett, 141 *216 Wash.App. 797, 173 P.3d 948 (2007), that the trial court must engage in the five-part Bone-Club analysis before conducting all or a portion of voir dire outside of the public forum of the courtroom. Duckett, 141 Wash. App. at 802-03, 173 P.3d 948. In Duckett, as here, the trial court had conducted a portion of voir dire in chambers without engaging in the Bone-Club analysis. The Duckett court held that the failure to address the Bone-Club analysis and enter findings and conclusions on each factor required reversal and a new trial. Duckett, 141 Wash.App. at 803, 805, 809, 173 P.3d 948; see also State v. Frawley, 140 Wash.App. 713, 167 P.3d 593 (2007).
¶ 11 Noting "the court's independent obligation to safeguard the open administration of justice," Duckett held that "[a]ny closure of a public judicial proceeding required the trial court to engage in the Bone-Club analysis." Duckett, 141 Wash.App. at 804, 807, 173 P.3d 948. Here, as in Duckett, "only a limited portion of voir dire was held outside the courtroom" but that "does not excuse the failure to engage in a Bone-Club analysis." Duckett, 141 Wash.App. at 808, 173 P.3d 948. Here, as in Duckett, the trial court violated the defendant's public trial right by conducting a portion of voir dire in chambers without first weighing the necessary factors. "Prejudice is presumed, and the remedy is a new trial." Duckett, 141 Wash.App. at 809, 173 P.3d 948. Duckett was an accurate articulation of the law in Washington prior to our Supreme Court's decision in Momah.
¶ 12 As noted, before Momah's publication, Washington case law indicated that courtroom closure implicated considerations in addition to the rights of the defendant, that courtroom closure is a circumstances where the burden is placed on the trial court, and that the court must show why closure is necessary. Before Momah, our Supreme Court's precedent made the Bone-Club guidelines mandatory and directed that the trial court's failure to employ those requirements was reversible error. Prejudice was presumed and remand for a new trial was required. Orange, 152 Wash.2d at 814, 821-22, 100 P.3d 291.
¶ 13 In Momah, our Supreme Court seemed to back away from its earlier articulation in Orange that application of the Bone-Club guidelines is required and that the failure to so employ them when closing the courtroom is reversible error. Instead, Momah seemed to downgrade the Bone-Club guidelines by referring to them as "the better practice" rather than as requirements. Momah, 167 Wash.2d at 152 n. 2, 217 P.3d 321. Momah noted that all courtroom closures do not trigger a conclusive presumption of prejudice warranting automatic reversal of convictions and a new trial and holds that "[i]n each case the remedy must be appropriate to the violation." Momah, 167 Wash.2d at 156, 217 P.3d 321.
¶ 14 Momah purportedly applied the United States Supreme Court's decision in Waller v. Georgia, 467 U.S. 39, 104 S.Ct. 2210, 81 L.Ed.2d 31 (1984), reading that case to require "a showing that the defendant's case was actually rendered unfair by the closure." Momah, 167 Wash.2d at 150, 217 P.3d 321. Momah pointedly noted that the remedy employed in Waller was remand for a new suppression hearing, not a new trial. Momah, 167 Wash.2d at 150, 217 P.3d 321. Momah noted that had the court in Waller automatically granted the defendant a new trial without requiring a new suppression hearing, the result would have been an improper windfall for the defendant and such result would not be in the public interest. Momah, 167 Wash.2d at 150, 217 P.3d 321.
¶ 15 Momah's treatment of the public's interest in open court proceedings is also notable. Prior to Momah, this was a separate and equally compelling basis for requiring the trial court to comply with the Bone-Club guidelines before closing the courtroom. "[T]he constitutional requirement that justice be administered openly is not just a right held by the defendant. It is a constitutional obligation of the courts. . . . When the courtroom doors are locked without a proper prior analysis under Orange and . . . [Bone-Club], the people deserve a new trial." Easterling, 157 Wash.2d at 187, 137 P.3d 825 (Chambers, J., concurring). But while Momah acknowledged the public's constitutional interest in open proceedings, see Momah, 167 Wash.2d *217 at 147-49, 217 P.3d 321 (discussing Wash. Const. art. I, § 10), it opined that the requirement of a public trial "is primarily for the benefit of the accused." Momah, 167 Wash.2d at 148, 217 P.3d 321. Momah seems to conflate the public's and the defendant's interests in an open proceeding and subsume the public's interest under the defendant's interest, at least in the particular circumstances present in Momah. Momah, 167 Wash.2d at 147-49, 217 P.3d 321.
¶ 16 Moreover, Momah curiously cites the five Bone-Club guidelines (complete with each guideline's mandatory "must" language) and acknowledges that Bone-Club provides the appropriate criteria for determining if closure is appropriate, but it does not address the failure to comply with the obligatory language in those guidelines. Momah, 167 Wash.2d at 148-49, 217 P.3d 321. It merely notes that if the reviewing court determines that the defendant's right to a public trial was violated it should then "devise[] a remedy appropriate to that violation." Momah, 167 Wash.2d at 149, 217 P.3d 321.
¶ 17 Despite Momah's seeming retreat from prior Washington precedent, Momah nevertheless acknowledged that "structural" error "warrants automatic reversal" and remand for a new trial. Momah, 167 Wash.2d at 149, 217 P.3d 321. Momah identifies "structural error" as one that necessarily renders a criminal trial fundamentally unfair or an unreliable vehicle for determining guilt or innocence. Momah, 167 Wash.2d at 149-50, 155-56, 217 P.3d 321. Momah acknowledged that the court closures in Bone-Club, Easterling, and Orange were such "structural" errors. Momah, 167 Wash.2d at 150-51, 217 P.3d 321. Key to Momah's determination on that issue as to Bone-Club and Easterling, was the defendant's exclusion from the proceedings in those cases. Momah, 167 Wash.2d at 150-51, 155, 217 P.3d 321. In Orange, the defendant's family was excluded. See Momah, 167 Wash.2d at 150-51, 217 P.3d 321 (discussing Orange).[5] The Momah court distinguished the circumstance before it noting that the defendant affirmatively assented to the closure, argued for its expansion, had the opportunity to object but did not, actively participated in the closed proceeding, and benefitted from such closure. Momah, 167 Wash.2d at 151-52, 217 P.3d 321. Moreover, the purpose of the closure was to safeguard the defendant's right to a fair trial by an impartial jury rather than to protect any other interests. Momah, 167 Wash.2d at 151-52, 217 P.3d 321. Accordingly, because the defendant in Momah affirmatively accepted and actively participated in the closed hearing, our Supreme Court held that the courtroom closure in that circumstance was "not a structural error" warranting reversal. Momah, 167 Wash.2d at 156, 217 P.3d 321.
¶ 18 In Strode, a plurality decision released the same day as Momah, the lead opinion reiterated and applied what was the established law in Washington prior to Momah that it is the trial court's independent obligation to perform the Bone-Club analysis prior to courtroom closure to protect both the defendant's public trial right and the public's right to open proceedings. Strode, 167 Wash.2d 222, 227-30, 217 P.3d 310. Where a Bone-Club analysis is not conducted prior to courtroom closure, prejudice is presumed (i.e. structural error which cannot be considered harmless) and automatic reversal is mandatory. Strode, 167 Wash.2d at 231, 217 P.3d 310. Only four justices agreed on all these points. Two more justices concurred in the result, agreeing that in the case under consideration the trial court was required to expressly engage in a Bone-Club analysis on the record and its failure to do so required automatic reversal and remand. The concurrence disagreed with the lead opinion to the extent it appeared to conflate the defendant's public trial right with the interests of the media and the public in open proceedings. "A defendant should not be able to assert the right of the public or the press in order to overturn his conviction when his own right to a public trial has been safeguarded as required under Bone-Club or has been waived." Strode, 167 Wash.2d at *218 236, 217 P.3d 310 (Fairhurst, J., concurring in result only).
¶ 19 Accordingly, despite Momah, it appears that six justices agree that a Bone-Club analysis (or some equivalent) is required prior to closing the courtroom. What was not clear after Momah and Strode is what the appropriate remedy should be when Bone-Club guidelines are not employed prior to closure. Apparently, the reviewing court is to look to the record to see if the trial court employed some equivalent of Bone-Club and then fashion a remedy appropriate to the violation if the trial court failed to engage in an adequate inquiry. As noted, the remedy deemed appropriate in Momah (a new hearing) reflected the circumstances of that case; that is, defendant's affirmative acceptance and active participation in the closed proceedings. The appropriate remedy in Strode was automatic reversal (six justices agreed) even though the defendant participated in the closed hearing. This was so because no Bone-Club analysis (lead opinion) or its equivalent (concurrence) had occurred.[6]
¶ 20 Three months after Momah and Strode, the United States Supreme Court decided Presley v. Georgia, ___ U.S. ___, 130 S.Ct. 721, ___ L.Ed.3d ___ (2010), a per curiam opinion holding that under the First and Sixth Amendments, voir dire of prospective jurors must be open to the public. Presley, 130 S.Ct. at 723-24. This requirement is "binding on the States." Presley, 130 S.Ct. at 723. The Court explained that while the accused has a right to insist that the voir dire of the jurors be public, there are exceptions to this general rule. The right to an open trial "`may give way in certain cases to other rights or interests, such as the defendant's right to a fair trial or the government's interest in inhibiting disclosure of sensitive information.'" Presley, 130 S.Ct. at 724 (quoting Waller, 467 U.S. at 45, 104 S.Ct. 2210). "`Such circumstances will be rare, however, and the balance of interests must be struck with special care.'" Presley, 130 S.Ct. at 724 (quoting Waller, 467 U.S. at 45, 104 S.Ct. 2210). The Presley Court stated that Waller provided the appropriate standards for courts to apply before excluding the public from any stage of a criminal trial.[7]Presley, 130 S.Ct. at 724.
¶ 21 Noting that "[t]rial courts are obligated to take every reasonable measure to accommodate public attendance at criminal trials," Presley, 130 S.Ct. at 725, the Court reiterated that "`[a]bsent consideration of alternatives to closure, the trial court could not constitutionally close the voir dire.'" Presley, 130 S.Ct. at 724 (quoting Press-Enterprise Co. v. Superior Court of California, Riverside County, 464 U.S. 501, 511, 104 S.Ct. 819, 78 L.Ed.2d 629 (1984) (Press-Enterprise I)). Moreover "trial courts are required to consider alternatives to closure even when they are not offered by the parties," this is because "[t]he public has a right to be present whether or not any party has asserted the right." Presley, 130 S.Ct. at 724-25.
¶ 22 Additionally, the trial court must make appropriate findings supporting its decision to close the proceedings.
There are no doubt circumstances where a judge could conclude that threats of improper communications with jurors or safety concerns are concrete enough to warrant closing voir dire. But in those cases, the particular interest, and threat to that interest, must "be articulated along with findings specific enough that a reviewing court can determine whether the closure order was properly entered."
Presley, 130 S.Ct. at 725 (quoting Press-Enterprise I, 464 U.S. at 510, 104 S.Ct. 819). *219 The Court held that "even assuming, arguendo, that the trial court had an overriding interest in closing voir dire, it was still incumbent upon it to consider all reasonable alternatives to closure." Presley, 130 S.Ct. at 725. Thus, where the trial court fails to sua sponte consider reasonable alternatives and fails to make the appropriate findings, the proper remedy is reversal of the defendant's conviction. Presley, 130 S.Ct. at 725.
¶ 23 Thus Presley, applying the federal constitution, resolves any question about what a trial court must do before excluding the public from trial proceedings, including voir dire. Here, the trial court closed a portion of voir dire by interviewing certain jurors in chambers. By shutting out the public without first considering alternatives to closure and making appropriate findings explaining why closure was necessary, the trial court violated Paumier's and the public's right to an open proceeding. Presley requires reversal of Paumier's burglary conviction, and we so hold.
¶ 24 In his supplemental briefing, Paumier argues that this case is factually more like Strode than it is like Momah. That is so, but as we have explained Presley has eclipsed Momah and Strode and controls the outcome of Paumier's case.
¶ 25 The State argues in its supplemental briefing that applying Momah and Strode would violate a juror's right to keep his or her medical conditions and treatment private under the federal Health Insurance Portability and Accountability Act (HIPAA). Again, Presley resolves the matter. As discussed above, Presley does not require all proceedings to be open in all circumstances. Presley requires a trial court to consider reasonable alternatives to closure and to make appropriate findings explaining why closure is necessary under the particular circumstances of the case before closing the proceeding. Accordingly, a proceeding may be closed under Presley, when these requirements are met. Presley, 130 S.Ct. at 725.
¶ 26 In sum, for the reasons discussed, we reverse Paumier's convictions for residential burglary and third degree theft.

Right to Self-Representation
¶ 27 Paumier also asserts that the trial court violated his constitutional right to represent himself by summarily denying his request to so proceed. We agree.
¶ 28 A criminal defendant has an independent constitutional right to represent himself or herself without the assistance of legal counsel. State v. Breedlove, 79 Wash. App. 101, 106, 900 P.2d 586 (1995). The exercise of this right must be requested by the defendant. The request must be knowingly and intelligently made, unequivocal, and "timely, i.e., it may not be used to delay one's trial or obstruct justice." Breedlove, 79 Wash.App. at 106, 900 P.2d 586. We review the trial court's disposition of a request to proceed pro se for abuse of discretion, mindful of the guidelines enunciated in State v. Fritz, 21 Wash.App. 354, 361, 585 P.2d 173 (1978), review denied, 92 Wash.2d 1002 (1979).
¶ 29 Under Fritz, the trial court's discretion lies along a continuum that corresponds with the timeliness of the request to proceed pro se. Accordingly, where a defendant makes a proper demand for self-representation well before the trial, the right of self-representation exists as a matter of law. Where the demand is made on the eve of trial, the existence of the right depends on the particular facts of the case with a measure of discretion reposing in the trial court. Finally, where the request is made during the trial, the right to proceed pro se rests largely in the informed discretion of the trial court. Fritz, 21 Wash.App. at 361, 585 P.2d 173; see also Breedlove, 79 Wash.App. at 106-07, 900 P.2d 586. Thus, if the request is made just before or during trial, the trial court "must exercise its discretion by balancing the important interests implicated by the decision," namely, the defendant's interest in self-representation and society's interest in the orderly administration of justice. Breedlove, 79 Wash.App. at 107, 900 P.2d 586.
¶ 30 Further, Breedlove held that "the timeliness requirement should not operate as a bar to a defendant's right to defend pro se." Breedlove, 79 Wash.App. at 109, 900 P.2d 586. The Breedlove court held that the *220 trial court abused its discretion in denying the defendant's request to represent himself because there was no evidence that his motion was designed to delay his trial or that granting it would have impaired the orderly administration of justice. Breedlove, 79 Wash.App. at 110, 900 P.2d 586. "The erroneous denial of a defendant's motion to proceed pro se requires reversal without any showing of prejudice." Breedlove, 79 Wash. App. at 110, 900 P.2d 586; see also State v. Stenson, 132 Wash.2d 668, 737, 940 P.2d 1239 (1997) (unjustified denial of defendant's right to represent himself requires reversal), cert. denied, 523 U.S. 1008, 118 S.Ct. 1193, 140 L.Ed.2d 323 (1998).
¶ 31 Here, Paumier's request to represent himself was made after the jury was selected but before it was sworn. Paumier expressed his dissatisfaction with his attorney and simply said he would rather present his case himself. He did not ask for a continuance.[8] The trial court denied the request on the sole basis that it was untimely.
¶ 32 As in Breedlove, Paumier's request to represent himself was clear, and there is no evidence that the trial would have been delayed or that granting his request would impair the orderly administration of justice. Accordingly, we hold that the trial court abused its discretion in denying Paumier's request to represent himself.
¶ 33 Because the unjustified denial of this right requires reversal, we reverse Paumier's convictions and remand for further proceedings consistent with this opinion.[9]
I concur: HOUGHTON, P.J.
QUINN-BRINTNALL, J. (dissenting).
¶ 34 Because Rene P. Paumier failed to timely object and preserve the "closed courtroom" issue for our review, I disagree with the majority's decision to address the merits of the alleged public trial right violation and respectfully dissent. I also disagree with the majority's reliance on the United States Supreme Court opinion in Presley v. Georgia, ___ U.S. ___, 130 S.Ct. 721, ___ L.Ed.3d ___ (2010), to reverse Paumier's convictions.
¶ 35 In Presley, without applying the standards set out in Waller v. Georgia, 467 U.S. 39, 104 S.Ct. 2210, 81 L.Ed.2d 31 (1984), the trial court, over the defendant's objections, excluded Presley's uncle (and apparently any other member of the public) from attending the jury selection proceedings, stating that there was insufficient room in the courtroom to accommodate prospective jurors and one observer. 130 S.Ct. at 722. Presley's counsel expressly objected to the exclusion of his client's uncle, who might well have been of assistance to the defense in selecting a jury, as well as other members of the public, from the jury selection process. Presley, 130 S.Ct. at 722.
¶ 36 Thus, in Presley, our nation's highest Court had before it a trial court thatover the clear objection of the defendant and the observerclosed the courtroom without applying standards necessary to insure protection of the defendant's Sixth and the public's First Amendment rights to a public trial. In contrast, Paumier did not assert, and in my opinion waived, his Sixth Amendment right to a public trial by failing to object to the trial court's decision to allow jurors to answer questions they considered embarrassing in chambers on the record with all parties present.
¶ 37 Although Presley holds that the defendant's Sixth Amendment right to a public trial extends to the jury selection process,[10] it does not hold that this error cannot be waived or that the public trial right under *221 the federal constitution need not be preserved for review. See Reid v. Georgia, 286 Ga. 484, 690 S.E.2d 177, 181 (2010) (distinguishing Presley on the basis that Reid did not object to the trial court's temporary courtroom closure and reasoning, "The improper closing of a courtroom is structural error requiring reversal only if the defendant properly objected at trial and raised the issue on direct appeal."); but see State v. Strode, 167 Wash.2d 222, 229, 217 P.3d 310 (2009) ("`defendant's failure to lodge a contemporaneous objection at trial [does] not effect a waiver [of defendant's public trial right]'" (alterations in original) (quoting State v. Brightman, 155 Wash.2d 506, 517, 122 P.3d 150 (2005))). Under the invited error doctrine, a reviewing court should decline to address the merits of a claimed error if the appealing party induced the court to commit the conduct later asserted to be error. State v. Henderson, 114 Wash.2d 867, 870, 792 P.2d 514 (1990). The invited error doctrine applies even to manifest constitutional errors. State v. McLoyd, 87 Wash. App. 66, 70, 939 P.2d 1255 (1997), aff'd by State v. Studd, 137 Wash.2d 533, 973 P.2d 1049 (1999).
¶ 38 Here, although Paumier did not actively seek to have jurors questioned about sensitive matters in chambers, the record shows that he participated in the process and accepted the benefit of obtaining more candid answers to embarrassing questions. Accordingly, I would hold that Paumier has failed to preserve any objection to the trial court's in-chambers questioning of potential jurors for appellate review. I am aware of contrary authority but cannot agree that it rests on sound constitutional basis.
¶ 39 In addition, Paumier lacks standing to assert the public's First Amendment right to a public trial. The standing doctrine generally prohibits a party from suing to vindicate another's rights. Haberman v. Wash. Pub. Power Supply Sys., 109 Wash.2d 107, 138, 744 P.2d 1032, 750 P.2d 254 (1987). Neither Presley nor any other case expressly holds that a criminal defendant may assert the public's rights to a public trial, although it has ruled on the public's right through a criminal defendant's appeal. See, e.g., State v. Bone-Club, 128 Wash.2d 254, 259, 906 P.2d 325 (1995).
¶ 40 I wholeheartedly agree with the statement in the plurality opinion in Strode that a defendant "cannot waive the public's right to open proceedings." 167 Wash.2d at 229, 217 P.3d 310. But it does not follow that he has standing to assert that right to overturn a verdict entered by an impartial group, the public's representatives on the jury. Importantly, this is not a situation in which the defendant's and the public's right to a public trial are aligned to the degree that the defendant can fairly represent the public's interest in exercising its public trial rights or impartially decide whether to press to extend precious taxpayer resources on a new trial. In the context of jury selection, those rights may clearly be in conflict. As demonstrated here, Paumier had an interest in allowing jurors to be questioned privately in order to encourage candid answers to his questions. The public, in contrast, has an interest in knowing that the jury selection process was fair and to discover how, by whom, and, in challenges for cause, why potential jurors were challenged or removed from jury service. I continue to believe that the defendant's and the public's interests in a public trial are not sufficiently aligned to allow a defendant who does not object to a juror's request to be questioned on the record in chambers to remain silent and then allege a violation of the public's right to a public trial for the first time on appeal.
¶ 41 I also cannot agree that the record before us supports a determination that the trial court abused its discretion by denying Paumier's untimely request that he represent himself. Unlike the trial court's file, the record before us in this appeal does not contain any indication of Paumier's level of function or a history of his relationships with counsel. I am loathe to baldly rule that a trial judge has abused her discretion on such an inadequate record.
¶ 42 In addition, Paumier chose to appeal the judgment in this case. Assuming the majority's opinion reversing that judgment stands, the correct remedy is a remand for a new trial. In re Pers. Restraint of Orange, 152 Wash.2d 795, 814, 100 P.3d 291 (2004). As *222 always, following reversal of a defendant's conviction, the State may decide not to retry the defendant or the defendant and the State may reach an agreement. That does not, in my opinion, alter the proper statement of the remedy. The evidence presented at trial was sufficient to support the decision of the fair and impartial jury that rendered it and double jeopardy does not bar retrial. Accordingly, even under the majority analysis, our authority is limited to reversing the judgment and remanding to the superior court for a new trial or other proceeding consistent with the majority opinion.
NOTES
[1] Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).
[2] Rather than a court reporter, the court used a digital recording system with cordless microphones to make the record.
[3] While Strode was pending, the Department of Corrections released Paumier from custody in July of 2009. His appeal is not moot, however, because Paumier asks us in part to reverse his conviction.
[4] The Bone-Club analysis provides:

1. The proponent of closure or sealing must make some showing [of a compelling interest], and where that need is based on a right other than an accused's right to a fair trial, the proponent must show a "serious and imminent threat" to that right.
2. Anyone present when the closure motion is made must be given an opportunity to object to the closure.
3. The proposed method for curtailing open access must be the least restrictive means available for protecting the threatened interests.
4. The court must weigh the competing interests of the proponent of closure and the public.
5. The order must be no broader in its application or duration than necessary to serve its purpose.
Bone-Club, 128 Wash.2d at 258-59, 906 P.2d 325 (quoting Allied Daily Newspapers of Washington v. Eikenberry, 121 Wash.2d 205, 210-11, 848 P.2d 1258 (1993)).
[5] Notably, in Waller, upon which Momah primarily relies, the defendants were not excluded from the pre-trial suppression hearing that was closed to the public. See Waller, 467 U.S. at 42, 104 S.Ct. 2210.
[6] After Momah and Strode, it seemed that we would have to await another case for our Supreme Court to clarify the rules and procedures for courtroom closures. That is, whether the five-part Bone-Club analysis was mandatory, and what repercussions would follow courtroom closure without such analysis, were issues that seemed to be unsettled after Momah and Strode.
[7] The Waller standards require:

"[T]he party seeking to close the hearing must advance an overriding interest that is likely to be prejudiced, the closure must be no broader than necessary to protect that interest, the trial court must consider reasonable alternatives to closing the proceeding, and it must make findings adequate to support the closure."
Presley, 130 S.Ct. at 724 (quoting Waller, 467 U.S. at 48, 104 S.Ct. 2210).
[8] Moreover, Paumier's criminal history, which includes multiple prior theft convictions and a prior burglary conviction, indicates that he was familiar with the charges and perhaps the criminal court proceeding that he faced. Also, defense counsel told the trial court that Paumier "has had copies of discovery throughout the proceedings." 1 RP at 9.
[9] We would normally order a new trial, but because Paumier is no longer in custody we leave to the parties the pursuit of further proceedings as they deem appropriate.
[10] The United States Supreme Court has similarly held that the public's First Amendment right to a public trial extends to the jury selection process. Press-Enter. Co. v. Super. Ct. of Cal., Riverside County, 464 U.S. 501, 104 S.Ct. 819, 78 L.Ed.2d 629 (1984).