FILED
COURT OF APPEALS
DIVISION II

2013 DEC 17 AM 8: 48

STATE OF WASHINGTON

BY_____
        DEPUTY

# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| In re Personal Restraint Petition of | No. 37217-7-II |
| FELIX JOSEPH D'ALLESANDRO | |
| | PUBLISHED OPINION |

HUNT, J. — In this personal restraint petition (PRP), Felix Joseph D'Allesandro challenges his 2004 jury trial conviction for first degree premeditated murder with a deadly weapon. He argues that his previous appellate counsel rendered ineffective assistance in failing to include a *Bone-Club*[1] challenge to the temporary courtroom closure during jury selection in the petition for review from his direct appeal.[2] Agreeing, we grant this PRP.

---

[1] *State v. Bone-Club*, 128 Wn.2d 254, 906 P.2d 325 (1995).

[2] D'Allesandro also argues that (1) his trial counsel rendered ineffective assistance by failing to move for curative instructions or a mistrial after his (D'Allesandro's) co-defendant's attorney repeatedly questioned D'Allesandro about other witnesses' credibility and engaged in incomplete impeachment; and (2) the trial court violated his constitutional public trial right when, without first applying the *Bone-Club* factors, (a) it temporarily closed the courtroom during jury selection to question privately approximately one-third of the jury pool, and (b) it closed the courtroom to question a sitting juror about his possibly knowing a witness. Because we find the ineffective assistance of former appellate counsel argument dispositive, we do not address most of these other arguments.

No. 37217-7-II

## FACTS

The State charged Felix Joseph D'Allesandro and Mert Celebisoy with first degree murder while armed with a deadly weapon for the stabbing death of David George.[3] *State v. Celebisoy*, noted at 131 Wn. App. 1003, 2006 WL 14519, at *2, *review denied*, 158 Wn.2d 1004 (2006). Their high profile cases were consolidated for trial in March 2004. *Celebisoy*, 2006 WL 14519, at *3. The jury convicted both defendants as charged.

### I. CLOSED COURTROOM DURING INITIAL JURY VOIR DIRE

Before voir dire began, D'Allesandro's counsel apparently proposed and prepared a juror questionnaire, which asked jurors to indicate whether they wished to be interviewed privately about any of the questions. The trial court's instruction sheet accompanying this questionnaire stated: "Further questioning, if any, will be conducted privately if you request it. That is, the public and other potential jurors will not be present."[4] State's Third Suppl. Resp., App. B at 3. D'Allesandro subsequently asked the trial court about interviewing prospective jurors who had stated on their juror questionnaires that they preferred to be examined "privately," as both the questionnaires and the trial court's accompanying instruction sheet had promised. 1 Verbatim Report of Proceedings (VRP) (Mar. 8, 2004) at 2-3.

D'Allesandro's counsel stated:

---

[3] The facts are set forth in our unpublished decision in D'Allesandro's 2006 direct appeal. *State v. Celebisoy*, noted at 131 Wn. App. 1003, 2006 WL 14519, at *2, *review denied*, 158 Wn.2d 1004 (2006).

[4] Other than the title "the court's instructions," the record does not show who proposed the instruction sheet or whether it was the trial court's standard cover sheet. Nor does the record show that the trial court and counsel discussed private voir dire or D'Allesandro's public trial rights before his counsel submitted the questionnaire.

2

No. 37217-7-II

> It occurred to me . . . after I had an opportunity to review the jury questionnaires, it would make sense for the parties and the Court to interview prospective jurors who wished to speak with us privately, *to do those interviews prior to voir dire*, and my rationale is that if those interviews result in any excuses for cause, it would diminish the pool right off the bat, and secondly and perhaps more importantly from my perspective we *don't run the risk of tainting the remaining pool*, if we do it on the front end as opposed to doing it on the back end. And I know there are a lot of people in the—on this side of the bar in the well, and normally, at least in my experience, those interviews are conducted in chambers, and *I would suggest that those interviews take place in an empty courtroom. By that, I mean apart from the remaining prospective jurors.*

1 VRP (Mar. 8, 2004) at 2 (emphasis added). Celebisoy, the State, and the trial court agreed that speaking to those jurors whose questionnaires had requested "private" questioning, before beginning the general voir dire, would be the most efficient approach. I VRP at 3. Celebisoy's counsel also commented that it might lessen the chance "of tainting the larger [jury] pool." 1 VRP (Mar. 8, 2004) at 3.

The trial court responded:

> Well, all of the attorneys are in agreement, and I don't find myself in disagreement, but I maybe would like to make a further suggestion. The jurors have been waiting a long time so I would like to invite them in and tell them something about how this process is working, and then it occurs to me that in addition to those who we've flagged as—on the basis that they wanted to be asked certain questions in private instead of in public, *private meaning in the presence of the attorneys, the defendants, the clerk, so on*—it doesn't mean absolute privacy, but it means *outside of what's open to the general public*—and that's *a procedure we generally afford jurors out of respect for their privacy.* They're not the ones on trial here, and sometimes there are personal and embarrassing matters that they want to properly disclose, but shouldn't be made to do so in the glare of the whole community necessarily.
>
> But that in addition to those that have answered "yes" to the question that they need to answer certain questions in private, *there are some others who've indicated they know something about this case from the media, and it seems it might be prudent to talk to some of those individuals in private so that the questions they answer don't educate the other jurors who profess to not know anything about this in the media* and that *maybe we should expand that group to include those individuals and ask them media-related questions at the same time,*

3

and then there *might be some of those who have to be excused for cause* and others who don't, but then that would give us a pool of jurors from which to pick which is more like those with which we are usually faced.

1 VRP (Mar. 8, 2004) at 4-5 (emphasis added). The State and D'Allesandro agreed that this approach was "fine" with them.[5] 1 VRP (Mar. 8, 2004) at 5.

The trial court then discussed the logistics:

So you can be thinking about [identifying those who have had some media contact and think need further in-depth interviews], and I think I'll invite [the entire venire] in, make some preliminary remarks as is usually the case, and then explain that we're going to question those jurors who wanted to be questioned privately first.

Would you find out if my regular courtroom is available for that? Or we could even clear this courtroom I suppose for that.

I'm thinking maybe what we'll do is maybe close this courtroom temporarily. *I mean the trial's going to be open to the public, but for these in camera interviews, maybe we'll just ask members of the public to leave.* Then we don't have to upset the counsel table, the court reporter and everybody else, and then open the door again to whoever wants to attend once we're not talking privately with a particular juror. I think that might be a way to do that.

I see there's some observers here, which are welcome to be here throughout the trial, but what we're talking about is how do we pick everybody else up and move them into the judge's chambers? There's quite a few people here to even fit into a judge's chambers plus a juror. Our chambers are not that large so I think that's the common-sense way to do this.

All right. So anything else before we invite the venire to come in?

1 VRP (Mar. 8, 2004) at 7-8. The State commented that it had nothing further; neither defendant

---

[5] The State then asked the trial court whether it was going to question individually those potential jurors who had said they knew about the case, even if they had no recollection of any of the details. The trial court replied that it would not question every potential juror who had heard about the case. The court then directed counsel to

indicate for [the court] out of those who have had some media contact, those they think need further in-depth interviews so questions can be asked that don't necessarily educate the balance of the jury about what was reported, especially in the most recent article yesterday which was quite revealing.

1 VRP (Mar. 8, 2004) at 6-7.

No. 37217-7-II

responded or objected.

The trial court then invited the venire into the courtroom and announced:

Because there are so many of you and because there was a special questionnaire we couldn't use the usual process that is ordinarily used, so what you've begun to go through, and what you'll go through for the balance of the day, I want you to know is not how we ordinarily do things in Thurston County Superior Court, and the reason that this case is different is because instead of the 35 jurors we usually have, we have over 90 jurors, and not every case has a questionnaire. This case does. One of the things on this questionnaire asked if certain people want to be asked certain questions outside the view of the community, *which we generally allow for jurors' privacy*, and all of those things take time.

. . .

We're going to do the voir dire in this courtroom because of its size. It's the ceremonial courtroom and it's the largest courtroom in the building. Once we get down to the actual jury, which will be 14 jurors, we'll move up to courtroom 208, which is department five where I usually sit as the judge in that courtroom. The way we're going to proceed is I'm going to give you some introductory remarks continuing on what I'm saying now, introduce you to the major participants, give you your oath as jurors, and then—I think it makes more sense and is a better use of everyone's time—begin the questioning of the jurors who either have asked to be questioned about certain things in private plus certain jurors that the attorneys have selected to ask certain questions in private and see— of those who are questioned privately—how many of those leave us. Then we'll come back with the remaining venire and handle it in a more regular way.

1 VRP (Mar. 8, 2004) at 8, 9, 10.

The trial court identified 18 prospective jurors by number as "jurors who indicated they had individual questions." 1 VRP (Mar. 8, 2004) at 22. Each defense counsel selected at least one of these jurors for the initial private interviews. The trial court then told the remaining jury pool, "[A]ll those except the ones that were named, you're excused" for the next two hours. 1 VRP (Mar. 8, 2004) at 24.

After the venire left the courtroom, the trial court commented that ordinarily it would take each juror into chambers with the clerk, court reporter, the attorneys, and defendants to

5

"undergo questioning in private"; but because there were too many people to fit into chambers, it was going to "turn this courtroom into the judge's chambers," which meant that it was "going to ask all the public to now leave, except for the jurors." 1 VRP (Mar. 8, 2004) at 25. The parties do not dispute that the trial court did not expressly address the five *Bone-Club* factors on the record before temporarily closing the courtroom to the public to question prospective jurors in private. *See Bone-Club* 128 Wn.2d at 258-59.

This closed portion of the proceedings was conducted on the record. The trial court and the parties individually questioned approximately 27 prospective jurors, nearly one-third of the jury pool. The trial court excused approximately 14 prospective jurors for cause, health concerns, and work conflicts. The trial court then asked the remaining prospective jurors to reenter the courtroom for general voir dire; it is not clear from the record whether the trial court also allowed members of the public or the defendants' families to reenter the courtroom at this time.

## II. POST-TRIAL PROCEDURE

### A. Direct Appeal

On direct appeal to this court, D'Allesandro asserted in his pro se Statement of Additional Grounds (SAG)[6] that the trial court had violated his public trial rights by closing the courtroom during a portion of jury selection. *Celebisoy*, 2006 WL 14519, at *9. In a January 2006 unpublished opinion, we rejected this argument "[b]ecause the trial court took this action at

---

[6] RAP 10.10.

6

No. 37217-7-II

D'Allesandro's request to protect his right to a fair and impartial jury." *Celebisoy*, 2006 WL

14519, at *9. We explained:

> The doctrine of *invited error* "prohibits a party from setting up an error at trial and then complaining of it on appeal." *State v. Pam*, 101 Wn.2d 507, 511, 680 P.2d 762 (1984), *overruled on other grounds [by] State v. Olson*, 126 Wn.2d 315, 893 P.2d 629 (1995). Moreover, we note that D'Allesandro has *failed to demonstrate any prejudice* flowing from the trial court's limited interviewing of potentially tainted jurors in camera, as he requested. Thus, D'Allesandro's claim fails.

*Celebisoy*, 2006 WL 14519, at *10 (emphasis added).[7]

In a footnote related to this analysis, this court quoted D'Allesandro's counsel's request,

which request is quoted in full above. But this quoted material omitted the last line of defense

counsel's statement in which counsel qualified his request by stating, "By that, I mean *apart*

---

[7] We further explained:
> We note our Supreme Court's recent decision in *State v. Brightman*, 155 Wn.2d 506, 517-18, 122 P.3d 150 (2005), which followed *In re Personal Restraint of Orange*, 152 Wn.2d 795, 100 P.3d 291 (2004), in holding that the trial court erred in closing the courtroom to spectators during the entire jury selection process, even though the defendant did not object to the closure.
>
> Even assuming, without deciding, that the partial courtroom closure here rose to the level of the closures in *Brightman* and *Orange*, these cases are distinguishable. D'Allesandro not only failed to object to the closure, as in *Brightman* and *Orange*; but also *he expressly requested in camera interviews of prospective jurors* in order to avoid tainting the jury pool. The trial court granted this request for a limited time and a limited purpose, resulting in excusing several potentially tainted jurors for cause.
>
> We acknowledge that our review would have been easier had the trial court articulated its application of the five *Brightman* and [*Bone-Club*] factors before granting D'Allesandro's request to exclude the public from this limited portion of the jury voir dire. We further note, however, that even had D'Allesandro not requested limited "closure" of the courtroom, (1) such in camera interviews are appropriate, and (2) it could be a legitimate trial strategy not to object where such proceedings preserve the impartiality of the jury pool.

*Celebisoy*, 2006 WL 14519, at *10 n.13 (emphasis added).

*from the remaining prospective jurors.*" 1 VRP (Mar. 8, 2004) at 2 (emphasis added). We affirmed D'Allesandro's conviction, vacated his exceptional sentence under *Blakely*,[8] and remanded for resentencing. *Celebisoy,* 2006 WL 14519, at *16.

### B. Petition for Review

In February 2006, D'Allesandro's appellate counsel petitioned the Washington State Supreme Court for review of our decision. Appellate counsel's sole argument in the petition was that the trial court had erred in denying D'Allesandro's request for a lesser included instruction.

Four months later, in June 2006, the Court issued *State v. Easterling,* 157 Wn.2d 167, 137 P.3d 825 (2006),[9] holding that the trial court had committed reversible error in closing the courtroom to Easterling and to the public during a pretrial hearing on his co-defendant's motion to sever jury trials without first conducting a *Bone-Club* analysis. *Easterling,* 157 Wn.2d at 171-72. The Court declared: "The presumptive remedy for a public trial right violation is reversal and remand for a new trial." *Easterling,* 157 Wn.2d at 174.

D'Allesandro's petition for review was still pending. D'Allesandro contacted his appellate counsel and asked her to raise the *Bone-Club* challenge based on the Supreme Court's new *Easterling* decision. Appellate counsel responded that if the Court denied review of D'Allesandro's petition for review, he could file a personal restraint petition (PRP), "arguing any

---

[8] *Blakely v. Washington,* 542 U.S. 296, 124 S. Ct. 2531, 159 L. Ed. 2d 403 (2004).

[9] Our Supreme Court granted review of *Easterling* in July 2005, after D'Allesandro's trial, but before appellate counsel filed D'Allesandro's petition for review. The Supreme Court heard argument in November 2005, three months before D'Allesandro's petition for review.

issue he feels the court should consider including those related to the *Easterling* decision." PRP at App. H.

On October 10, our Supreme Court denied review. *State v. Celebisoy*, 158 Wn.2d 1004 (2006). We mandated the direct appeal, and on November 28, the trial court resentenced D'Allesandro.

## C. PRP

As previously suggested by his appellate counsel, D'Allesandro filed the instant PRP. In support, he attached declarations from his mother and father stating that (1) they had been excluded from the courtroom during at least a portion of voir dire; (2) they had wanted to be present during voir dire to show support of their son but were excluded, (3) they were not offered the opportunity to object, and (4) they would have objected if they had been given the opportunity. His mother also declared that she and D'Allesandro's father had approached the bailiff before leaving the courtroom, explained that D'Allesandro was their son, but were told to leave. PRP App. E. D'Allesandro's father further declared: "I know that prior to being excluded, defense counsel asked the judge (at [a] sidebar) if the parents of both defendants could stay for voir dire."[10] PRP App. F.

We set D'Allesandro's PRP for oral argument before a panel of judges. Before the first oral argument, the panel requested and received supplemental briefing on our Supreme Court's then recent "*Bone-Club*" decisions in *State v. Strode*, 167 Wn.2d 222, 217 P.3d 310 (2009), and *State v. Momah*, 167 Wn.2d 140, 217 P.3d 321 (2009), and our then recent decisions in *State v.*

---

[10] We note that the record does show that an untranscribed sidebar conference occurred at this point in the proceedings. *See* 1 VRP (Mar. 8, 2004) at 25-26.

*Paumier*, 155 Wn. App. 673, 230 P.3d 212 (2010), *aff'd*, 176 Wn.2d 29, 288 P.3d 1126 (2012), and *State v. Bowen*, 157 Wn. App. 821, 239 P.3d 1114 (2010). The panel heard argument on September 3, 2010, and then stayed this case pending our Supreme Court's decisions in *State v. Wise*, 176 Wn.2d 1, 288 P.3d 1113 (2012) and *Paumier*.

We lifted the stay in November 2012, after which the parties filed supplemental briefs addressing our Supreme Court's most recent public trial decisions in *Wise*, *Paumier*, *In re Pers. Restraint of Morris*, 176 Wn.2d 157, 288 P.3d 1140 (2012), and *State v. Sublett*, 176 Wn.2d 58, 292 P.3d 715 (2012).[11] We then set the case for a second oral argument before a panel of judges.

## ANALYSIS

D'Allesandro argues that appellate counsel on direct appeal rendered ineffective assistance because had she raised the *Bone-Club* issue and cited *Easterling* in his petition for review, the Supreme Court would have granted review and reversed on grounds of structural error and automatic prejudice, and because our opinion in his direct appeal conflicts with the Supreme Court's later-decided *Easterling* opinion on this issue. We agree.

---

[11] The parties have also filed several statements of additional authority. The State filed an additional authority citing *State v. Halverson*, ___ Wn. App. ___, 309 P.3d 795, 795-96 (2013), *petition for review filed*, No. 89461-2 (Wash. Oct. 23, 2013), in which we rejected a public trial violation claim (based on questioning a sitting juror in a closed courtroom). Here, however, we do not reach D'Allesandro's second public trial issue involving the trial court's questioning of a sitting juror; therefore, we do not further consider *Halverson*. D'Allesandro filed an additional authority citing *In re Pers. Restraint of Brockie*, ___ Wn.2d ___, 309 P.3d 498, 502 n.2 (2013), which mentions cases addressing the standard of review applied to issues that are per se prejudicial on direct appeal when those issues are raised collaterally in personal restraint petitions. Because we address the public trial issue here as an ineffective assistance of appellate counsel claim (emanating from D'Allesando's earlier direct appeal), we need not address the standard discussed in *Brockie*. We do, however, address D'Allesando's additional authority *In re Pers. Restraint of Netherton*, 177 Wn.2d 798, 801, 306 P.3d 918 (2013).

## I. APPLICABLE STANDARDS OF REVIEW

### A. PRP

Generally, to be entitled to relief, a timely PRP[12] petitioner must establish "either that he or she was actually and substantially prejudiced by constitutional error or that his or her trial suffered from a fundamental defect of a nonconstitutional nature that inherently resulted in a complete miscarriage of justice." *In re Pers. Restraint of Finstad*, 177 Wn.2d 501, 506, 301 P.3d 450 (2013) (citing *In re Pers. Restraint of Elmore*, 162 Wn.2d 236, 251, 172 P.3d 335 (2007)). Courts apply this heightened standard of review to promote finality when the petitioner has had previous opportunities for judicial review. *See In re Pers. Restraint of Coats*, 173 Wn.2d 123, 132, 267 P.3d 324 (2011) (citing *Elmore*, 162 Wn.2d at 251 (heightened standard); *In re Pers. Restraint of Isadore*, 151 Wn.2d 294, 299, 88 P.3d 390 (2004) (no prior opportunity for review); *In re Pers. Restraint of Cook*, 114 Wn.2d 802, 810-12, 792 P.2d 506 (1990)).

But when, as is the case in an ineffective assistance of appellate counsel claim, the petitioner has not had a previous opportunity to obtain judicial review, this heightened standard does not apply. *Coats*, 173 Wn.2d at 132; *Isadore*, 151 Wn.2d at 299. Instead, "[t]o prevail on a claim of ineffective assistance of appellate counsel, [Petitioner] must demonstrate the merit of any legal issue appellate counsel raised inadequately or failed to raise and also show [ ]he was prejudiced." *See In re Pers. Restraint of Netherton*, 177 Wn.2d 798, 801, 306 P.3d 918 (2013) (citing *In re Pers. Restraint of Lord*, 123 Wn.2d 296, 314, 868 P.2d 835, *cert. denied*, 513 U.S.

---

[12] The parties agree that D'Allesandro's PRP is timely under *In re Pers. Restraint of Skylstad*, 160 Wn.2d 944, 949-51, 162 P.3d 413 (2007).

849 (1994)); *see also Morris*, 176 Wn.2d at 166 (citing *Smith v. Robbins*, 528 U.S. 259, 285, 120 S. Ct. 746, 145 L. Ed. 2d 756 (2000); *Orange*, 152 Wn.2d at 814)).

## B. Ineffective Assistance of Appellate Counsel

To establish deficient performance by appellate counsel, D'Allesandro must show that his appellate counsel should have known, but failed, to raise the public trial issue in the petition for review. *See Morris*, 176 Wn.2d at 167. To establish prejudice, D'Allesandro must show that had appellate counsel included the public trial issue in the petition for review, (1) the Supreme Court would have granted review, and (2) the Court would have reversed D'Allesandro's conviction or remanded the case back to this court and we would have reversed the conviction. *See Netherton*, 177 Wn.2d at 801.

## C. Public Trial Rights

We review whether the trial court has violated a defendant's public trial right de novo. *Sublett*, 176 Wn.2d at 70 (citing *Momah*, 167 Wn.2d at 147-48 (citing *Bone-Club*, 128 Wn.2d at 256)). Additionally,

> There is a strong presumption that courts are to be open at all stages of the trial. A criminal defendant's right to a public trial is found in article I, section 22 of the Washington State Constitution and the Sixth Amendment to the United States Constitution, both of which provide a criminal defendant with a "public trial by an impartial jury." The public trial right is not absolute but may be overcome to serve an overriding interest based on findings that closure is essential and narrowly tailored to preserve higher values. *Waller v. Georgia*, 467 U.S. 39, 45, 104 S. Ct. 2210, 81 L.Ed.2d 31 (1984).

*Sublett*, 176 Wn.2d at 70-71 (footnote omitted). And "[i]t is well settled that the public trial right extends to jury selection [including] the questioning of individual prospective jurors." *In re Pers. Restraint of Copland*, 176 Wn. App. 432, 439, 309 P.3d 626 (2013).[13]

II. FAILURE TO CHALLENGE CLOSED COURTROOM IN DIRECT APPEAL PETITION FOR REVIEW

We agree with D'Allesandro that our Supreme Court likely would have taken review of his *Bone-Club* public trial issue and reversed his conviction if his appellate counsel had raised it in his direct appeal petition for review because (1) the Supreme court issued *Easterling* while D'Allesandro's petition was pending; (2) *Easterling* clearly established that (a) the waiver and invited error doctrines do not apply in the public trial context because it is the trial court's responsibility to examine the *Bone-Club* factors, even when the defense requests courtroom closure,[14] and (b) such closures are per se prejudicial, calling for automatic reversal and remand for a new trial on direct appeal; and (3) our decision in D'Allesandro's direct appeal was contrary to the Supreme Court's later-filed *Easterling* decision.

A. Deficient Performance

D'Allesandro first satisfies the deficient performance prong of the ineffective assistance of appellate counsel test by showing that counsel should have known to raise the public trial issue in the petition for review. *See Morris*, 176 Wn.2d at 167. Counsel filed the petition for review in February 2006, just over a year after our Supreme Court issued *Orange*, four months

---

[13] *Mot. for discretionary review filed*, No. 89368-3 (Wash. Oct. 7, 2013).

[14] D'Allesandro also notes that the record shows that he did *not* ask the trial court to exclude the public; thus, waiver/invited error would not have been a bar to raising this issue in the petition for review.

after the Court issued *Brightman*, six months after the Court granted review of *Easterling*, and

three months after the Court heard argument in *Easterling*. The Court issued its opinion in

*Easterling*[15] in June 2006, four months before it denied D'Allesandro's petition for review; in the

interim, D'Allesandro had specifically brought *Easterling* to his appellate counsel's attention

when he asked her to add the *Bone-Club* issue (from our appellate decision[16]) to the petition for

review, based on this new Supreme Court decision. Instead, appellate counsel advised

D'Allesandro that he could wait to raise the issue later in a PRP; this advice was deficient given

the existing higher standard of prejudice necessary to warrant collateral relief, in contrast to the

per se prejudice rule applicable on direct appeal for this type of public trial violation. *See, e.g.,*

*Copland*, 176 Wn. App. at 439-41 (explaining distinction between automatic reversal on direct

---

[15] We agree with the State that the proceeding at issue in *Easterling* was substantially different from the private voir dire issue here. Nevertheless, our Supreme Court's broadly stated holding in *Easterling* appears to apply to all public trial violations, at least when challenged on direct appeal: (1) "The presumptive remedy for a public trial right violation is reversal and remand for a new trial," and (2) a defendant "does not waive his right to appeal an improper closure by failing to lodge a contemporaneous objection" because it is the *trial court's* responsibility to resist courtroom closure and to consider the *Bone-Club* factors regardless of whether there is an objection. *Easterling*, 157 Wn.2d at 174, 176 n.8, 181 (citing *Orange*, 152 Wn.2d at 814; *Brightman*, 155 Wn.2d at 514-15).

[16] In our previous 2006 opinion in D'Allesandro's direct appeal, we relied on both invited error and harmless error analyses, both of which the Supreme Court questioned in *Easterling*. *See Easterling*, 157 Wn.2d at 176, 181; *see also Celebisoy*, 2006 WL 14519, at *10. Although *Easterling* discusses waiver rather than invited error, it emphasizes that it is the trial court's responsibility to conduct the *Bone-Club* analysis before allowing a closure, regardless of whether the defendant has requested the closure or not. Furthermore, if appellate counsel had included the public trial issue in D'Allesandro's petition for review, counsel likely would have discovered that we had relied on an incomplete record quotation to support our invited error analysis, which undermines that analysis.

appeal for public trial violations in contrast to higher standard of showing actual and substantial prejudice necessary to prevail in a PRP).[17]

Moreover, close in time to our Supreme Court's consideration of D'Allesandro's petition for review, it reviewed and later accepted other similar public trial cases for review.[18] For example, our Supreme Court issued *Orange, Brightman,* and *Easterling* near or shortly after the time D'Allesandro's counsel filed his petition for review, counsel should have been aware that the Court was keenly interested in accepting review of cases involving this emerging issue and developing the public trial doctrine. We hold that D'Allesandro has satisfied the deficient performance prong of the ineffective assistance of appellate counsel test based on appellate counsel's initial failure and subsequent refusal[19] to include the public trial *Bone-Club* issue in his petition for review to our Supreme Court.

---

[17] *Copland* also involved the private interviewing of potential jurors, in chambers, rather than in open public court. Here, the trial court would have conducted these private interviews in chambers had there been sufficient space; instead, it sought to create "chambers" in the courtroom by excluding the public, including D'Allesandro's family, during these individual juror interviews. Division Three, however, denied Copland's personal restraint petition because the trial court had attempted to apply the *Bone-Club* criteria and because Copland could not meet the high PRP standard of showing actual and substantial prejudice in juxtaposition with the parties' and trial court's efforts to insure a fair and impartial jury to try his case (in contrast to a direct appeal, in which prejudice would have been presumed and reversal would have been automatic). *Copland,* 176 Wn. App. at 441, 449.

[18] Most notably, our Supreme Court accepted Division Three's certification of *Strode* in November 2007 and granted review of *Momah* in April 2008.

[19] In so holding, it is not our intent to suggest that appellate counsel must always brief and include issues that her client requests; on the contrary, we recognize that the right to counsel embodies the inherent value that professionals provide to their clients. But under the circumstances of this case, where the issue is whether appellate counsel should have been aware of this pivotal issue, that her client specifically raised the issue and she advised him to handle it in a later PRP further establishes counsel's deficient performance.

## B. Prejudice

Turning to the second prong of the ineffective assistance of counsel test, D'Allesandro shows prejudice, namely that (1) our Supreme Court likely would have taken direct review or remanded the case back to us for reconsideration, and (2) his public trial violation claim would likely have been successful in winning reversal of his conviction if the Supreme Court had granted review of the public trial issue because he would have been entitled to benefit of the per se prejudice/automatic reversal rule for this error on direct appeal and remand for a new trial. *See Netherton*, 177 Wn.2d at 802. If appellate counsel here had included the public trial issue in D'Allesandro's petition for review, the Supreme Court likely would either granted review or stayed the case pending the other public trial cases it was considering.[20] *See Netherton*, 177 Wn.2d at 802[21]; *see also e.g.*, *Strode*, 167 Wn.2d at 224-25 (certification from Division Three of this court accepted in November 2007); *Momah*, 167 Wn.2d at 140 (petition for review granted January 2008).

---

[20] We fail to perceive how, as the State asserts, the justices considering D'Allesandro's petition for review would have noticed sua sponte the potential public trial issue, in the absence of this issue in the petition. Although our Supreme Court has authority to review issues not raised by the parties, it generally limits its consideration to the issues the parties place before them in the petition for review and answer. *See* RAP 13.7(b) (Court limits review to "questions raised in the . . . petition for review and the answer, unless the Supreme Court orders otherwise upon granting of the motion or petition."); *State v. Collins*, 121 Wn.2d 168, 178, 847 P.2d 919 (1993).

[21] Netherton established ineffective assistance of appellate counsel because, if the relevant issue had been raised, the Court would have stayed a petition for review of the Netherton's direct appeal pending a similar case on review and, under that other decision, Netherton would have been entitled to relief. *Netherton*, 177 Wn.2d at 801.

D'Allesandro also would have been able to establish that his courtroom closure during voir dire was the type of closure that our Supreme Court has held establishes per se prejudice requiring automatic reversal on direct appeal. In *Wise*, a five-justice majority of our Supreme Court held that (1) public trial violations during voir dire are per se prejudicial because this is the type of structural error wherein "it is *impossible* to show whether the structural error of deprivation of the public trial right is prejudicial"; and (2) the remedy for a voir dire violation must be a new trial because it is unreasonable to think that a "'redo'" of voir dire would provide an adequate remedy. *Wise*, 176 Wn.2d at 19 (emphasis added); *see also Easterling*, 157 Wn.2d at 181.[22]

In *Momah*, our Supreme Court found no public trial right violation when the defendant proposed closing the courtroom. 167 Wn.2d at 151-52. Arguably, the facts here are similar. But our Supreme Court seems to be retreating from *Momah*, by recently noting, for example, that *Momah* "presented a unique confluence of facts." *Wise*, 176 Wn.2d at 14-15; *see also Paumier*, 176 Wn.2d at 35-36. Furthermore, unlike in *Momah*, the full quote from the record here (in contrast to the truncated quote in our 2006 opinion) arguably shows that D'Allesandro's counsel did *not* ask the trial court to exclude the *public* from the individual juror voir dire; rather, defense counsel asked that the individual voir dire simply take place "*apart from the remaining*

---

[22] In *Easterling* (which did not involve jury voir dire), a seven-justice majority ruled that (1) denial of the right to a public trial "is one of the limited classes of fundamental rights not subject to harmless error analysis," and (2) "[p]rejudice is necessarily presumed where a violation of the public trial right occurs." 157 Wn.2d at 181 (citing *Bone-Club*, 128 Wn.2d at 261-62; *Neder v. United States*, 527 U.S. 1, 8, 119 S. Ct. 1827, 144 L. Ed. 2d 35 (1999)).

*prospective jurors.*"[23]  1 VRP (Mar. 8, 2004) at 2-3 (emphasis added).  And, again unlike in

*Momah*, the trial court here, rather than D'Allesandro, expanded the scope from private

questioning about personal matters to include questioning potential jurors about media exposure

(a topic that is not likely to be embarrassing or difficult for a potential juror to talk about in

public).

Although the trial court's statements here noted public trial rights generally, its

statements also suggested that it was the trial court's common practice to conduct private voir

dire on certain private or personal topics in chambers and that the trial court may have believed

that only the evidentiary phase of the trial was required to be open to the public.[24]  Finally, unlike

in *Momah*, (1) there is nothing in the record suggesting that the parties and the court otherwise

discussed how to tailor any closures narrowly, or the public's right to presence during this part of

the proceedings[25]; and (2) the trial court did not address the *Bone-Club* factors on the record,

---

[23] Additionally, although D'Allesandro's counsel proposed the jury questionnaire that advised the jurors that they could request to be questioned in private, there is nothing in the record showing that D'Allesandro knew that this procedure could potentially implicate his public trial rights or that defense counsel's questionnaire did not merely reflect the standard procedure for this courtroom.  Furthermore, the questionnaire did not explain what "private" meant:  That explanation was contained in a cover sheet, which the record does not show or even suggest was drafted by defense counsel rather than by the court.

[24] Given that *Orange* was not filed until eight months after this trial, it is understandable that the trial court may not have considered jury selection to be subject to public trial requirements.

[25] Nor is there any indication in the record that other factors (such as lack of space) would have interfered with questioning the jurors individually in public about their media exposure because the trial court questioned the individual jurors in an empty courtroom and the record does not show that there were any space issues during this part of the proceedings.

either explicitly, or implicitly as did the trial court in *Momah*.[26] As in *Morris*,[27] we find prejudice here in the fact that if appellate counsel had raised the public trial issue on direct appeal, D'Allesandro would have received a new trial due to structural error.[28] *See Copland*, 176 Wn. App. at 440.

We hold that D'Allesandro has shown that (1) had counsel raised this public trial issue in the petition for review, our Supreme Court would have likely either accepted review or stayed the petition for review pending other public trial cases it had accepted for review; (2) the Supreme Court would have held that the trial court violated D'Allesandro's public trial rights, which constituted per se prejudice on direct appeal, or at least remanded to our court to address this issue; and (3) D'Allesandro would have been entitled to reversal of his conviction and

---

[26] *See Wise*, 176 Wn.2d at 12-13. *See also Strode*, 167 Wn.2d at 228-29; and 232, 234-36 (J. Fairhurst concurring).

[27] 176 Wn.2d at 167-68.

[28] To underscore our conclusion about the likelihood of D'Allesandro's success on direct appeal had appellate counsel pursued it, we note several recent Supreme Court opinions addressing the public trial issue in the jury voir dire context, holding that, at least on direct review, interviewing jurors in private without first conducting a *Bone-Club* analysis is a structural error that is per se prejudicial warranting reversal and not subject to a harmless error analysis. *See e.g., Paumier*, 176 Wn.2d at 32, 35; *Wise*, 176 Wn.2d at 14-15.

No. 37217-7-II

remand for a new trial.

Accordingly, we grant D'Allesandro's PRP and deny the State's request for costs under RCW 10.73.160.

Hunt, J.

We concur:

Worswick, C.J.

Maxa, J.